## NOUGUÈS v. DOUGLASS et al.

7   65
h144 696

The act of April 18, 1856, providing for the erection of a State capitol, at a cost not to exceed $300,000, is unconstitutional and void.

The eighth article of the Constitution of this State is an express restriction upon the powers of the Legislature, and there is no power in the judiciary to set it aside, whatever inconvenience may result from a legitimate application of the provision.

So far from the necessary and ordinary expenses of the State forming an exception to the restriction, they were evidently among those especially included in it.

The power of taxation was given to the Legislature without limit, for all purposes allowed by the Constitution.

As to the point raised, that conceding the construction of the Court to be correct, the provision is only advisory, and addressed to the legislative conscience, and not to the judiciary: *It seems,* that an express restriction upon the powers of the Legislature cannot be said to be merely advisory.

Some of the restrictions upon the powers of the Legislature, are addressed solely to that body, and of which it is the exclusive judge, as the provisions relating to the qualifications, election, and return of its own members.

The true rule seems to be this: that when the right to determine the extent and effect of the restriction is either expressly, or by necessary implication, confided to the Legislature, then the judiciary has no right to interfere with the legislative construction. But in all other cases of restriction, it is the right and duty of the Supreme Court to decide the effect and extent of the restriction in the last resort, and the question, whether that right is vested in the Legislature or in the judiciary, must be equally decided by the Supreme Court.

The Constitution is itself a law, and must be construed by some one. The judiciary, from the very nature of its powers, and the means given it by the Constitution, must possess the right to construe the Constitution, in all cases not expressly, or by necessary implication, reserved to the other departments.

The Legislature has the actual power to pass any acts it pleases, and the Supreme Court would never interfere to prevent their passage. But when the Legislature transcends its powers, its acts are void, and are not laws.

If the Legislature had no right to create a state debt, beyond the limit fixed by the Constitution, it has no right to tax the people to pay a void debt.

As to the objection, that to address judicial process to the agents of the State is indirectly to implead the State herself: *Held,* that under our theory of government, the State has no interest in asking any thing that is not right, nor can she allow her agents to do so. The officer sued is not the State; he is only her servant, and only so in so far as he obeys her laws. The State, or any citizen, has the right to inquire, in the form of a plaintiff, whether an officer obeys or disobeys her laws.

In a case where a citizen claims to be injured by an alleged failure of a State officer to do his duty, the State is not a formal party to the record, nor responsible for costs in any event. Nor if the officer has failed to do his duty, can the State be injured by the decision of the Court. Neither can she be injured if the officer does his duty, and is sustained by the Court.

The eighth article of the Constitution is mandatory, and not directory, and applies to the current and necessary expenses of government.

The powers of taxation and appropriation are limited by the eighth article of the Constitution, and cannot be extended to debts contracted in violation thereof.

The act of drawing a warrant or paying money out of the treasury, is, in most cases, merely ministerial, and not political, and the officer, in such cases, is amenable to the Courts, and bound by their orders.

The Courts cannot interfere with the exercise of the political powers of the Legislature.

The power which the judiciary possesses to declare a law unconstitutional, comprehends the necessary authority of carrying its judgments into effect.

All debts contracted in violation of the eighth article of the Constitution are void, and the Legislature has no power to levy a tax, or appropriate money for the payment thereof.

The claims outstanding, contracted in defiance of the eighth article, can be legalized by being submitted to a vote of the people, in the manner provided by the Constitution, and in no other way.

Courts may interfere to prevent the payment of such debts, or the interest thereon, thus unconstitutionally contracted.
The case of the People v. Johnson affirmed.

APPEAL from the District Court of the Sixth Judicial District.

The defendants were Commissioners under the act of April eighteenth, 1856, providing for the erection of a State Capitol, the cost of which should not exceed three hundred thousand dollars. In pursuance of the provisions of the act, they contracted with the plaintiff, who was to be paid as the work progressed, the payments to be made in State bonds redeemable in thirty years, and the proceeds arising from the land donated to the State by the general government for the erection of public buildings, were pledged for the payment of the interest and principal. The act provides that defendants should draw their warrants on the State Comptroller in favor of the contractor, from time to time. On the 12th December, 1856, work had been done by the contractor to an admitted amount, and defendants refused to draw a warrant for the same, on the ground that the act was unconstitutional under the eighth article. It is admitted that at the date of the passage of the act, the existing debt of the State amounted to the sum of three hundred thousand dollars.

The plaintiff applied in the Court below for a *mandamus* to compel defendants to draw their warrants, or orders, in pursuance of the act. The Court below entered judgment, denying the writ. Plaintiff appealed.

*Robinson, Beatty & Botts*, for Appellants.
No brief on file.

*W. T. Wallace, Attorney-General*, for Respondents.
No brief on file.

BURNETT, J., after stating the facts :—

The questions involved in this case are substantially the same as those determined by this Court in the case of the People v. Johnson and others, decided at the last October Term. This is admitted by the counsel for plaintiff, and we are, therefore, asked to review that decision.

The first question raised by the record involves the construction of the eighth article of the Constitution of the State, and has been so fully considered in the opinion of this Court, in the case of the People v. Johnson, that there is little left to be said upon that point. The language of that article is exceedingly clear upon the point involved, and it is difficult to perceive how it can be misunderstood. It is an *express restriction*

Nougues v. Douglass.

upon the powers of the legislative department, so full, clear, definite and certain, that it would seem to need no application of legal rules of construction; and where the language of the Constitution is express and the intent plain, there is no power in the judicial department to set it aside, whatever inconvenience may result from a legitimate application of the provision.

The argument against the correctness of the construction given that article of the Constitution in the case of Johnson, is entirely based upon the supposed injurious consequences that it is alleged must flow from that decision; and it is insisted, for this reason, that the limitation does not apply to the necessary expenses of the government, and could not have been so intended. But the language of the article is against this ground, as well as the nature and reason of the case.

The Legislature is allowed to contract debts beyond the limits prescribed in case of war, invasion or insurrection; and if, as counsel contend, the limit does not include the necessary expenses of the government, why were these exceptions to that limit allowed? If the general rule include a case, it is wholly illogical to make such case an *exception* to that rule. The expenses in case of war, invasion and insurrection, are surely as *necessary* as the ordinary expenses of the State government; and if the general limit would not include these ordinary expenses of the State, why should the same general rule include the more pressing demand in time of war? There could be no good sense in making an idle exception, and the exception would seem to be idle upon the hypothesis that the counsel is correct.

So far from the necessary and ordinary expenses of the State forming an exception to the restriction, they were evidently among those especially included in it, and for obvious reasons.

The limit did not apply to the first Legislature, because by the sixteenth section of the twelfth article, it was so expressly provided; and that Legislature was "authorized to negotiate for such amount as may be necessary to pay the expenses of the State government." In other words, that limit did not apply to the first Legislature, which was expressly authorized to borrow money for the *necessary expenses* of the State.

And the reason of this exception in favor of that Legislature is obvious. The State could not obtain the immediate means to put the government in operation, without the power to borrow; and it was doubtless thought by the Convention that the three hundred thousand dollars authorized by the eighth article might not be sufficient to defray all the necessary expenses of the government, at the beginning of its existence, and before any revenue could be collected. After the government was put into operation, and revenue laws passed, it was supposed that the three hundred thousand dollars would be margin enough, at all times, to enable the State government to be economically and practical-

ly administered, without exceeding that limit, and this idea was founded in practical wisdom.

The power of taxation was given to the Legislature, without limit, for all purposes allowed by the Constitution, and the framers of that instrument knew that it was not the practice of governments, well conducted, to borrow money for the ordinary expenses of government. These expenses are regular and certain, and can easily be provided for by taxation. In reference to such expenses, there is no cause for surprise upon the Legislature. It is easy to anticipate their amount with a reasonble degree of certainty, and the framers of the Constitution knew that if they permitted the Legislature to borrow money to defray the ordinary expenses of the government, it would not be long before the State must be brought practically to rely upon the yearly revenue; for the reason, that a yearly deficit of the revenue would soon destroy the credit of the State, so that she could not borrow for any such purpose. A family, or State, that borrows to pay ordinary expenses, must soon have no power to borrow; and as the State, from the very nature of the case, must sooner or later come to the point of "paying as you go," it was wise, in the framers of our Constitution, to bring her to it at an *early period.* There was time gained and money saved.

Besides this, the Convention doubtless thought it unjust to throw the burthen of paying the present expenses of the government upon posterity, who would be compelled, in addition, to pay their own expenses, or resort to the same method of postponement.

In regard to works of internal improvement, there is less injustice in contracting a debt, for the reason that the work and debt both go down to those who pay, and the one compensates the other.

The argument of counsel, based upon the supposed injurious consequences of the opinion of this Court, ingenious and able as it is, would seem to be clearly inconclusive; and, if we concede the correctness of their construction, the practical result would be this only : that the argument would then have to be addressed to capitalists, instead of to this Court, and would soon be as unavailing in the one case as in the other.

The next point insisted upon is substantially this : that, conceding the construction of the Court to be correct, the provision is only *advisory,* or at least is solely adressed to the legislative conscience, and not to the judiciary.

It must be readily conceded that many provisions of the Constitution are addressed solely to the legislative department, and the cases put by the learned counsel, which regard the duty of the Legislature to protect the homestead, and provide for organizing the militia, etc., are clearly of this character. And it may be said that all those provisions, which require the Legislature

Nougues *v.* Douglass.

to do certain things, leaving the means and manner within the legislative discretion, are entirely beyond the reach of the judiciary, whose functions are wholly different from those of the law-making power.

But it is difficult to perceive how an express *restriction* upon the powers of the Legislature can be said to be merely *advisory*. The *denial* of a power is surely a very different thing.

It must also be conceded that some of the *restrictions* upon the powers of that body are addressed solely to the Legislature. As an instance, I may mention those provisions relating to the qualifications, elections, and returns of its own members; and although the Constitution expressly requires certain qualifications to constitute a member of either house, yet each house is expressly constituted the exclusive judge of those questions, and this Court could not, in any manner, review such a decision.

The true rule seems to be this, that when the right to determine the extent and effect of the restriction is either expressly or by necessary implication, confided to the Legislature, then the judiciary has no right to interfere with the legislative construction, but must take it to be correct. But in all other cases of restriction, it is the right and duty of this Court to decide the effect and extent of the restriction in the last resort. And as to the question, whether the right to determine the extent and effect of the restriction is vested in the Legislature, or in the judiciary, this Court must equally determine in the last resort.

And this results from the nature of our peculiar system of government, which is based upon the leading idea that all the inherent powers of government are divided between the Federal and State governments; and in one case are *delegated,* and in the other *reserved.* The general government is one of limited delegated powers; while the State governments possess all the powers incident to political government, and not delegated to the United States. The reserved powers of the State reside primarily in the people; and they, by our Constitution, have delegated all their own powers to the three departments—legislative, executive, and judicial—except in those cases where they have themselves exercised these powers, or expressly, or by necessary implication, *reserved* the same to themselves, to be exercised in the future. So far, then, as the people have exercised the legislative powers of government in the formation of the Constitution of the State, their action is conclusive upon all the departments. But in all cases where *not exercised and not reserved,* all the legislative power of the people of the State is vested in the Legislature, and all the executive power in the executive department, and all the judicial power in the judiciary.

The three great departments are essentially different in their constitution, nature, and powers, and in the means provided for each by the Constitution, to enable each to perform its appropri-

ate functions. These three departments are all equally necessary to the very existence of the government.

The legislative power is the creative element in the government, and was exercised partly by the people in the formation of the Constitution. It is primary and original, antecedent and fundamental, and must be exercised before the other departments can have anything to do. Its exercise is a condition *precedent,* and the exercise of the executive and judicial functions are conditions *subsequent.* The legislative power makes the laws, and then, after they are so made, the judiciary expounds and the executive executes them.

The Constitution is itself a law, and must be construed by some one. Each department must be kept within its appropriate sphere. There must, then, from the very nature of the case, be a power lodged somewhere in the government to construe the Constitution in the last resort. The different departments cannot be each left the sole and conclusive judge of its own powers. If such was the case, these departments must always contest and always be in conflict; and this cannot be the case in a constitutional government, practically administered.

The judiciary, from the very nature of its powers and the means given it by the Constitution, must possess the right to construe the Constitution in the last resort, in those cases not expressly, or by necessary implication, reserved to the other departments. It would be idle to make the Constitution the supreme law, and then require the judges to take the oath to support it, and after all that, require the Courts to take the legislative construction as correct. And the intent of the Constitution is more evident from the fact that the judiciary has been provided with ample means to carry out its determinations with the aid of the Executive.

The Legislature has the *actual* power to pass any act it pleases, and this Court would never interfere by injunction or otherwise to prevent the passage of such acts, as the Constitution has provided other and more appropriate remedies. While that body confines its action within the limits of the Constitution, its acts are rightful and conclusive; and when it transcends the limits of that instrument, its acts are void and bind no one. In the contemplation of our system they are not *laws*; and as the Courts are always open for redress, there is a practical mode provided for determining the rights of the citizen.

If, then, the Legislature had no right to create a State debt beyond the limit fixed by the Constitution, that body has no constitutional right to tax the people to pay a void debt. The power of taxation for purposes contemplated by the Constitution is unlimited in the Legislature, but such power does not exist for purposes not sanctioned by that instrument, but expressly prohibited. The restriction upon the power of the Leg-

islature would be nugatory, if the same *end* could be accomplished by other modes. The evil intended to be prevented would still exist, and the injury to the people would be the same. If the power to create the debt is denied, the power to levy taxes to pay it must equally be denied. The power to pay is a necessary incident to the power to contract, and they both must stand or fall together.

But it is objected that the judiciary has no means to enforce its decisions, because the State cannot be sued, and to address judicial process to the agents of the State, is *indirectly* to implead the State herself.

It is true, the eleventh section of the eleventh article of the Constitution, providing that suits may be brought against the State in such manner as shall be directed by law, would not authorize any suit against the State, as the Legislature has passed no law upon the subject; and it is, therefore, insisted that the true title of the case of "The People *v.* Johnson and others," is "The People of the State of California, plaintiff, *v.* The People of California, defendant." But this would seem to be an illogical conclusion.

In support of their position, the counsel for the plaintiff have referred to the cases of Devine *v.* Harvey, 7 Monroe, 440; Griffith *v.* Cochran, 5 Binney, 105; Decatur *v.* Paulding, 14 Peters, 497, and the United States *v.* Guthrie, 17 Howard, 284.

In construing the language of an opinion it is necessary to keep distinctly in view the facts and circumstances of the particular case decided. In the case of Devine *v.* Harvey, the facts were substantially these: The Legislature of Kentucky allowed a fixed sum of money to Devine; and Harvey, his creditor, sought to stop the money in the hands of the State Treasurer by process of garnishment. For this purpose he made the State Auditor, treasurer and Devine, parties. The Court decided that "the State could not become a garnishee," and that, to make the Treasurer a party in such a case, was making the State a party. The correctness of that opinion would seem clear. The State could not be made a stakeholder for individuals, and her treasurer brought into Court to await the litigation between other parties. But, in the same case, the learned Judge says: "Devine might have proceeded by *mandamus* against the auditor and treasurer to compel them to pay his money out of the treasury in case of their refusal," so that had Devine brought his suit against those officers, it would not have been a suit against the State.

In the case from 5 Binney, the writ was issued to the Secretary of the Land Office. It was the duty of that officer to make certain calculations, which he had in fact made, and about the correctness of which there was a difference of opinion between him and the plaintiff. The Court decided, that "had he refused to make

any calculation, or take any step whereby the business of the applicant might be despatched, it would certainly have been our duty to compel him by *mandamus.*" It is true the Court say that, " if the Commonwealth, by our Constitution, is not subject to an action but by its own consent, then we have no right to do that indirectly by *mandamus* which we have no power to do directly." But this general language must be construed with reference to the particular case; and then it will be seen that the *mandamus* would have been held good against the State officer, had the facts of that particular case supported it.

The case of Decatur *v.* Paulding was decided upon the ground that the Secretary of the Navy was required to determine whether Mrs. Decatur was entitled to two pensions: one under the act of March 3, 1837, which was general; and the other under the resolution of the same date, which was special; and if he had determined she was entitled under both, he must then determine whether the half-pay was to be calculated by the pay proper, or the pay and emoluments of an officer of the Commodore's rank; and after all this was done, he must have inquired into the condition of the navy pension fund, and the claims upon it, in order to ascertain whether there was money enough to pay all demands upon it, and if not money enough, how it was to be apportioned among the parties entitled. The ground upon which a majority of the Judges predicate their opinion, is that the secretary was invested with an exclusive *discretion*, which the Court would not control. Mr. Justice McLean and Mr. Justice Baldwin placed their decision upon the ground that Mrs. Decatur was only entitled to one, and not two, pensions, while Mr. Justice Catron took the broad ground that it was a contest between the executive and judiciary departments, and that the Courts could not, by writ of *mandamus*, force one of the secretaries of the great departments, contrary to the opinion and command of the President of the United States, to pay money out of the treasury, in any case whatever. The majority of the Court agreed in confirming the decision of Kendall *v.* The United States, 12 Peters, 524. In the latter case, Stakes and others were mail contractors, and for the performance of certain extra services they were allowed a credit upon the post-office books by the predecessor of the plaintiff, which allowance the plaintiff set aside, and Stakes and others applied to Congress for relief. Congress, by an act, required the Solicitor of the Treasury to pass upon the claims, and then required the Postmaster-General to credit them with the amount thus found due. This Mr. Kendall refused to do in part, upon the ground that all the claims passed upon were not intended to be submitted to the Solicitor. The Court decided that the plaintiff had no jurisdiction left; that the law definitely settled the amount, and required the credit to be given. This was, in effect, deciding that in a plain case, free

Nougues *v.* Douglass.

from doubt and settled by the law itself, the Court would compel the payment of money out of the treasury. Such was the effect of entering the credit on the books of the department, as it left that much more to be drawn by Stakes from the treasury.

In the case reported in 17 Howard, 284, the facts were these : Goodrich, the relator, was appointed a Judge of the Supreme Court of Minnesota, with a salary fixed by law, and the tenure of the office was fixed by act of Congress at four years. Before his term of office expired he was removed by the President of the United States, and a successor appointed. He insisted that the removal was illegal, and preferred his claim for the remaining portion of the salary to the First Auditor of the Treasury, who rejected it, and it then passed under the supervision of the Comptroller and Secretary, who likewise rejected it; the relator then applied for a *mandamus,* which was refused by the United Circuit Court for the District of Columbia, and the decision sustained by the Supreme Court in December, 1854. Mr. Justice Daniels delivered the opinion of the Court, and the question for decision, as stated by him, was this : "Whether under the organization of the federal government, or by any known principle of law, there can be asserted a power in the Curcuit Court of the United States for the District of Columbia, or in this Court, to command the withdrawal of a sum or sums of money from the treasury of the United States, to be applied in satisfaction of disputed or controverted claims against the United States ?"

It would seem that the learned judge by the expression "disputed or controverted claims," must have meant those claims, the amount of which had not been fixed by law, or if fixed by law, there was a strong doubt as to the claim of the particular party upon the fund. I presume Mr. Justice Daniels did not mean to take the ground, that, had there been no question as to the official character of Mr. Goodrich, that still the Court would not have afforded him a remedy against the department, had his claim been refused.

But, however this may be, Justices Curtis, Nelson, Geire, and Campbell, based their decision upon the sole ground that a *mandamus* was not the proper remedy to try the title to an office, while Mr. Justice McLean dissented from the opinion of the other judges; so that there was a majority of the judges who expressed no opinion in favor of the ground taken by Mr. Justice Daniels. And in the argument of the Attorney-General he insisted, "that the English cases cited and relied upon, have no applicability, because the United States Courts are not clothed with the same powers as the King's Bench. While that Court exercises all power, except where specially limited, the United States Courts can only exercise such as are specially conferred;" and this distinction exists between the Federal and State Courts.

As to the objection that suits like the one of The People *v.* Johnson and others, are substantially suits against the State, in addition to the considerations already stated, I think the case of Osborn and others *v.* The Bank of the United States, a very clear authority upon that point.    9 Wheat., 738.

In that case the Legislature ° of the State of Ohio had passed an act imposing a tax upon the bank, and directing the State Auditor to make out his warrant against the bank for the sum imposed.    Under such warrant the money of the bank was siezed and placed in the State treasury as the funds of the State. The bank sued the Treasurer and Auditor.    It was objected that it was substantially a suit against the State, though she was not a formal party on the record, and it was insisted that a State could not be sued in the United States Courts; as the eleventh amended article of the Constitution of the United States denied the right.    But the Supreme Court of the United States decided that the limitation only applied to *formal* parties on the record. And the Court further decided, that the act of Ohio was unconstitutional, and could not protect the treasurer from personal liability; and the fact that the money was in the vaults of the State treasury did not make it the property of the State, or put it in the custody of the State.    And in all cases where money is in the treasury under a void act, it may well be said that the State acquires no right, and the title to the property is not changed.

The idea that the State has any interest in these cases, that can be affected one way or the other by the decision rendered, would seem to be founded on a misconception of her true position.

The State, in the contemplation of our theory of constitutional government, can have no interest in asking anything but that which is right; nor can she allow her agents to do so.    She is as much interested in protecting the individual citizen, as in protecting the mass.    She stands entirely impartial as between the parties, and her only desire is for justice to be done.    She can gain nothing by injustice, and lose nothing by justice.    The officer sued is not the State, but only her servant; and he is only her servant in so far as he obeys her laws.    If he disobeys the laws, he violates her will; and whether he obeys or disobeys her laws, she has a right to inquire, in the form of a plaintiff, through the proper department.    So has every citizen the same right when injured by the illegal acts of the officer, done under color of official right.

The case of The People *v.* Johnson, was properly brought. The State wished to inquire, whether certain parties, acting ostensibly in her name, were about to do an act not authorized by her laws.    The only question which she had any interest in having determined, was the single one—what was the law?    And, in the contemplation of our theory, she was as much interested

one way as the other, and a decision either way would be equally satisfactory, for the reason, that the decision is held to be just; and because there must be formal parties on the record to give the Courts jurisdiction, it does not follow that the character of the State is changed by the formal attitude she assumes. As well might it be said, that the State was not competent to prosecute, and at the same time try her own cases. Criminals are prosecuted in the name of the State, and they are tried before her Courts, the Judges of which are paid by her; and yet she is impartial, as her only aim is justice, and she can therefore have no interest in convicting an innocent man, or in shielding the guilty.

And in cases like the present, when the citizen claims to be injured by the alleged failure of a State officer to do his duty, the State can have no interest that can be affected by the judgment; she is not a formal party on the record, and is not responsible for costs in any event, and the decision of the Court is held to be just to her officer. If he fails to do his duty, and is compelled to do so by legal proceeding, it is his fault, and the State is not injured by the decision; on the other hand, if he does his duty and the Court sustains him, the State is not injured. The State reposes implicit confidence in the wisdom and justice of her highest tribunals, and with their determinations she is content. The decision of the District Court is therefore affirmed.

MURRAY, C. J.—I would not consider it necessary to add anything to the able opinion of my learned associate, were it not for the public importance of this case, and a desire to place the opinion of this Court in such a light that it cannot be misunderstood.

In the case of The People v. Johnson, this Court stated, as a corollary from the conclusion to which it arrived, viz.: (that the wagon-road bill was unconstitutional,) that the public debt of the State, (i. e., all over the sum of three hundred thousand dollars, except so much thereof as was incurred by the first Legislature,) had been unconstitutionally contracted. This consequence seemed to flow so directly from the question decided, that we hardly expected to be arraigned before the bar of public opinion, on the charge of unnecessarily traveling out of the record, for the purpose of stabbing State credit, and injuring the value of State securities.

To our mind, the conclusion was so inevitable, that the merest tyro in the profession would at once have recognized it, and no layman, possessed of moderate capacity, could have failed to observe it. In alluding to the indebtedness of the State, we were anxious to place the matter, in all its importance, before the Legislature, which was about to convene, lest any doubt might arise as to the power of that body to legalize the indebtedness. We thought that the exigence of the case would warrant us in

intimating our opinion of the mode by which the same might be made valid as against the State.

It is not improper to state that the opinion of this Court has been misunderstood; and as the case before us embraces substantially the same questions that were involved in the case of The People *v.* Johnson, and the counsel for the plaintiff has asked us to review that decision, I shall briefly state my conclusions, and leave the question and its responsibilities to rest where it belongs. In this connection, it may be remarked that this task is not of our seeking. The duty has been devolved upon us of declaring a law unconstitutional, and if, in so deciding, the honor or credit of the State be impaired, the blame should rest on those who have violated the Constitution, or who refuse to make legal reparation, in the mode pointed out by the organic law of the State.

The first proposition I shall notice, is, that the eighth article of the Constitution is directory, and not mandatory. This was sufficiently considered in the former opinion of this Court. The language of the section, as well as the debates of the Constitutional Convention, was examined, and it was ascertained that the Convention understood and intended the provision to be mandatory. A proposition has since been advanced, that the Convention was mistaken as to what was the true meaning of the section, and that, as a similar provision exists in the Constitution of other States, we must resort to the Courts of those States, for a correct interpetration of the article.

I am aware that when a provision is borrowed from the Constitution or laws of another State, it is supposed to be taken with the judicial interpretation it has received in the Courts of that State; but this, like every other presumption, may be rebutted, and the true intention of the Convention being made manifest, the inference must fail. It is the first time I have ever heard that there was any exclusive property in words, and that when once used in a particular form, they become appropriated to the expression of a particular idea, which could not afterwards be separated from them, even at the will of the party employing them. We had always understood that Courts were to look to the intention of the Legislature, and, having ascertained that intention, to carry it out. It is always supposed that the framers of every instrument had some intention, and this is the first time I ever knew such intention to be defeated, by trying to establish the fact that the Legislature did not know what it was about. This conclusion not unfrequently forces itself upon Courts, but they are bound, out of charity and courtesy to the other departments of government, to suppose that their action originates in some intelligent design.

Having already decided that the eighth article is not directory, I shall next assume that it applies to the current or necessary

Nougues v. Douglass.

expenses of the government.  This conclusion, I think, is most obvious, and warranted by familiar rules of construction.  If not intended to apply to the ordinary expenses of the state, the article is entirely superfluous, as ample provision is made for the extraordinary expenses, such as war, invasion, and insurrection; or rather, they are excepted from the general rule, which, of necessity, applies to ordinary expenses.  Again, it is said the eighth article applies to works of internal improvement, and other works of a public character.  On examination, it will be found that these are exceptions to the general prohibition; that no debt or liability can be incurred, unless in case of war, to repel invasion, or to suppress insurrection; except the same shall be authorized by law for some "single object or work."  So far from this section extending only to the prohibition of some single object or work, we would be carrying the powers of the Legislature to their utmost extent, to hold that the present indebtedness can be legalized under this provision, and that a bill for this *single object*, or purpose, endorsed by the people, would be constitutional.

I do not think it necessary to repeat the arguments already advanced in the former decision of this Court, to show that we are not mistaken as to the intention of the Convention.  But it is contended, that the Legislature possess the sole power of appropriation and taxation, and that this Court has no power to interfere with the disposition of the revenues of the State; that the Legislature may appropriate the money in the treasury to pay this, or any other unconstitutional debt; that it is the exercise of a political power, which cannot be interfered with by the Courts.  This brings us directly to the most important question involved in this case.  If this proposition be true, then the decision of the Court is a mere *brutum fulmen*, and the Constitution a rope of sand in the hand of legislative power.  Constitutional government would be at an end, and a pure democracy substituted instead.

It is a well-settled rule of construction, that Constitutions, like laws, must be so construed, that full force and effect shall be given to every portion thereof.  Superfluous words are seldom employed in Constitutions, but every part is pregnant with meaning.  Adopting this rule in the present case, it will be found that the eighth article operates a limitation on the power of taxation and appropriation, otherwise it might as well be blotted out altogether.  The power of taxation and appropriation are incidents to the power of creating a debt or liability; the power of contracting a debt having been limited, it follows that a like limitation must rest upon the incidents of the debt.  In fact, the Constitution declares that no money shall be drawn from the treasury, except in consequence of appropriations made by law.  How, by law?  Why, legal appropriations?  And how can an appro-

priation to pay a debt be legal, when the debt is unconstitutional and void? No Legislature, nor even the Parliament of Great Britain, is omnipotent; and in the United States, where written constitutions are so highly prized, and have been invariably regarded as a limit, beyond which legislative power could not extend, no legislative enactment can be permitted to override their solemn mandates. If the Legislature were at liberty to avoid the behests of the Constitution by resolution or law, it would become supreme, and its exposition of that instrument would be final and conclusive.

" The genius and policy of our political institutions, rest upon principles which are at war with the doctrine of legislative omnipotence; ours is a government founded upon an express written compact, reduced to exactitude and certainty, expressive of the sovereign will of the people, fixing the limit and marking the bounds of legislative authority and power. The Legislature, instead of being omnipotent, must yield to its force, submit to its restraint, and bow to its authority. This written compact originated in a spirit of distrust of legislative authority, and from a conviction that legislative omnipotence was but another name for despotism. The evidence of that will rests not in the volition or judgment of those intended to be restricted by its own omnipotent fiat.

" Under our form of government, the Legislature is a creature of the Constitution, it owes its existence to that instrument, it derives its power from it; that is, the voice of the people in their original and unlimited capacity, fixing the limits of legislative power. It is the mandate of the creator, directed to and obligatory upon the creature; its authority is alone sovereign, absolute, and supreme.

" If the creature of the Constitution can pass judgment upon its obligations, and its judicial determination of its powers be clothed with the attributes of a judicial exposition, authoritative and of controlling force, then legislative omnipotence in this country would exceed that of the British Parliament, to an extent at least commensurate with the force of a written constitutional restriction, which it weighs down by the force of its judicial expositions. While the energies of Parliament are only directed to the exercise of powers, unlimited and uncontrolled, legislative power in this country would go further; it would break the fetters the Constitution has wrought out, throw off the restraint it has sought to impose, and annihilate the written will of the people. Parliament never carried its arrogance to such extent; it never, except in days of revolution, nullified the written will of the people it represented, by the force of parliamentary exposition; it never trod under foot a written compact; it never sat in judgment in its own cause, and demanded for its

decision in such case, respect paramount to Magna Charta."
Smith's Com. Const. Construction.

Again, says the same author : " It is no answer to the views
we have taken, that a power of judicial exposition, which shall
be arbitrary and beyond control, must, from necessity, be lodged
in some department; and hence, that it is as safe to intrust it to
legislative exposition, as to expositions made by the judicial
tribunals of the land, or that the combined wisdom and judg-
ment of a numerous body of men, is as likely to be correct as
that of a single Judge, or a limited number of Judges acting in a
judicial capacity; for the combined wisdom of the people, as em-
bodied in the Constitution itself, has otherwise settled that ques-
tion, by lodging the judicial attribute in the hands of another
co-ordinate department of the government." A very learned
Judge, as well as sage of the law, has very justly held, that " To
contend that Courts of judicature must obey the requisitions of
an act of the Legislature, when it appears to have been passed
in violation of the Constitution, would be to contend that the
law was superior to the Constitution, and that the Judge had
no right to look into it, and regard it as the paramount law.

" It would be to render the power of the agent greater than that
of his principal, and be declaring that the will of only one concur-
rent and co-ordinate department of the subordinate authorities
under the Constitution, was absolute over the other department,
and competent to control, according to its own will and pleasure,
the whole fabric of the government, and the fundamental law
in which it rested.   The attempt to impose restraint upon legis-
lative power would be fruitless, if the constitutional provisions
were left without any power in the government to guard and
enforce them.

" If the Constitution can be thus indirectly violated, instead of
its 'remaining firm and immovable as a mountain amid the
strife of storms, or a rock in the ocean amid the raging of waves,'
it becomes a frail bark, which may be rocked by the surges of
political strife, be tossed and shattered by every breeze which
ambition or avarice may excite, and it will become a total wreck,
whenever it shall have encountered three or four successive mu-
tilations upon the quicksands of legislative precedent."

I think there can be no doubt, that the Legislature cannot do,
indirectly, what they are forbid from doing directly, and that
having no power to create the debt, they cannot appropriate
money for its payment; that the powers of taxation and appro-
priation are limited by the eighth article of the Constitution,
and cannot be extended to debts contracted in violation thereof.

The power of the Courts to interfere in this behalf is resisted
on the ground that the power of the Legislature is political in
its character and cannot be controlled, and that the duties de-

volved upon the officers are also political and cannot be interfered with by the judiciary.

It is true that the Courts of this State could not interfere by writ or process to prevent the Legislature from passing an act, or the Governor from signing the same, but when the execution of the law has once been committed to a ministerial officer, it would be strange indeed, when the constitutionality of that law was drawn in controversy in the Courts of this State, if they would not have the power to pass upon it and arrest its operation if the act was void.   The act of drawing a warrant, or paying money out of the treasury, is, in most cases, merely ministerial, and in such case the officer is amenable to the Courts and bound by their orders.

This proposition was determined in the case of Morbury v. Madison, by the Supreme Court of the United States, as early as 1803, and has ever since been regarded as the settled law of the country.   It was so decided in this Court in 1852, in the case of Fowler v. Pierce; 2 Cal., p. 165.   An examination of the authorities cited by the appellant will show that every case turned upon the question whether the act required to be done rested in the discretion of the officer or not, except, perhaps, the case of the United States v. Guthrie, which went off on the point that the right to an office could not be tried in that form of proceeding.   It is a rule as old as the law itself, that there is no right without a remedy, and no wrong without a redress, and yet in a case affecting the present and future welfare of this country, it is gravely contended that the Constitution may be violated with impunity.

According to the appellant's own showing he has no right in Court, for he asks a *mandamus* to compel the Secretary of State and other officers to act in their official capacity, and at the same time denies the power of the Court to issue any process to carry its judgments into execution.   According to the argument of the appellant, if we were to decide the law under consideration constitutional, and award the *mandamus*, the Secretary of State *might refuse to obey* the order, and here would be exhibited the anomaly of a Court with jurisdiction to hear and determine, without the power of carrying its judgments into effect; a sort of legal monstrosity that never had an existence in any civilized system of jurisprudence.   According to the same argument, the Treasurer may refuse to pay every warrant presented to him, and the holder would have no relief.

It is useless to pursue this argument any further.   I am satisfied that the power which the judiciary possess to declare a law unconstitutional, comprehends the necessary authority of carrying its judgments into effect.

The act under consideration provides that any deficiency in the sale of the donated lands shall be met by appropriation from

the general fund of the State. This is the creation of a liability within the eighth article, and the act is, therefore, unconstitutional.

In conclusion, I would add, that all debts contracted in violation of the eighth article of the Constitution, are utterly void; that the Legislature has no power to levy a tax, or appropriate money, for the payment thereof; that such amounts outstanding, denominated and known as the State indebtedness, although possessing no legal existance, and no charge on the State, may be adopted and made legal in the mode pointed out in the case of The People v. Johnson, and in no other way; and that the Courts of this State may interfere to prevent the payment of debts, or the interest thereon, where they have been unconstitutionally contracted.

With the further consideration of this subject we have nothing more to do; the question now rests with the Legislature and the people.