[Sac. No. 1237.   In Bank.—September 19, 1904.]

## CHARLES BICKERDIKE, Respondent, v. STATE OF CALIFORNIA, Appellant.

COYOTE BOUNTY ACT—OBJECT OF ACT AUTHORIZING SUITS—CERTIFICATES —PRIMA FACIE EVIDENCE.—The object of the act of 1901, authorizing suits to be brought against the state by claimants under the Coyote Bounty Act of 1891, was to put the courts in the place of the auditing board of the state and to give to the certificates provided for in the Bounty Act the same legal effect that they would have had before the board of examiners, as *prima facie* evidence of the validity of the claims. The certificates are admissible in evidence; and in the absence of any showing by the state against the validity of the claims in suit, the certificates are sufficient evidence to warrant a judgment.

ID.—CERTIFICATES BY CLERK OF BOARD OF SUPERVISORS.—Certificates by the clerk of the board of supervisors, showing that they are made pursuant to the order of the board, and setting forth the order, which is in legal form under the statute, are sufficient proof of the action of the board.

Id.—REPEAL OF BOUNTY ACT.—The repeal of the Coyote Bounty Act of 1891 did not destroy the effect of the certificates as to claims already accrued. It simply prevented the creation of any further claims against the state for the killing of coyotes.

Id.—SUIT BY ASSIGNEE OF CLAIMS.—Claims against the state for bounty under the Coyote Bounty Act constituted property capable of assignment; and under the terms of the act of 1901, authorizing the "owners or holders of claims and demands" for such bounty to bring suit thereon, an assignee of such claims may sue therefor.

Id.—PAROL TRANSFER—WRITTEN POWER OF ATTORNEY—OBJECTION BY STRANGERS TO AGREEMENT.—Claims under the Coyote Bounty Act may be purchased and transferred by parol. The fact that written powers of attorney to receive warrants for the money and the money from the treasurer were given by the parties transferring their certificates to purchasers is not inconsistent with the fact of purchase shown by parol testimony; nor can the rule that parol evidence cannot be received to vary any written instrument be invoked by strangers to the agreement.

Id.—STATUTE OF LIMITATIONS—WAIVER BY STATE—CONSTITUTIONAL LAW—GIFT.—The two-year limitation fixed by the general act of 1893 applies only to suits brought under that act, and has no application to suits for coyote bounty claims brought under the act of 1901, which prescribes a limitation of twelve months from the passage of that act. The intention of the legislature to waive the benefit of any defense it may have had under section 2 of the act of 1893 against coyote bounty claims is manifest. There is no constitutional objection to such waiver by the state. The debt is not extinguished and the provision for payment of the claims, if established by suit brought in time under the act of 1901, is not a "gift," within the provisions of section 31 of article IV of the constitution.

Id.—PRESENTATION OF CLAIMS TO EXAMINERS—PLEADING.—It is not essential to the statement of a cause of action under the act of 1901 that the complaint should allege a presentation of the claims to the state board of examiners.

Id.—IMMATERIAL CONFLICT IN FINDINGS.—A conflict in the findings as to counts of the complaint upon which the defendant prevailed is immaterial upon defendant's appeal from a judgment for plaintiff upon the other counts.

Id.—CONSTITUTIONALITY OF BOUNTY ACTS.—Neither the original Coyote Bounty Act of 1891 nor the act of 1901, authorizing suits upon coyote bounty claims, is unconstitutional as being special legislation, or in violation of section 1 of article XVI of the constitution, forbidding the creation of debts by the legislature exceeding in the aggregate, with previous debts or liabilities, the sum of three hundred thousand dollars, without submission to a vote of the people.

Id.—MANNER OF CREATING INDEBTEDNESS OF STATE.—Section 1 of article XVI of the constitution refers only to the manner of creating

indebtedness of the state. Such indebtedness as has been authorized by the people of the state at a general election in the manner provided in that section cannot be taken into consideration in determining the power of the legislature to create an indebtedness, without such vote; nor can coyote claims actually paid, nor the current liabilities of the state for which provision is made by appropriation from current revenue, be considered debts within the prohibition of that section.

ID.—EFFECT OF BOUNTY ACT—DEBT NOT CREATED—OFFER UPON CONDITION.—The Bounty Act of 1891 did not of itself create any debt or liability. It was simply an offer upon condition, and only upon the performance of the condition by any person could a debt or liability arise on the part of the state. Where the indebtedness of the state created by the legislature at the time of its passage was only five thousand dollars, the Bounty Act could not be said upon its face to create an indebtedness in the aggregate exceeding three hundred thousand dollars. The only possible effect of the constitutional provision would be to render void any indebtedness incurred thereunder in excess of the constitutional limit.

APPEAL from a judgment of the Superior Court of Sacramento County and from an order denying a new trial. J. W. Hughes, Judge.

The facts are stated in the opinion of the court.

U. S. Webb, Attorney-General, George A. Sturtevant, Deputy Attorney-General, and Devlin & Devlin, for Appellant. °

George E. Bates, W. C. Van Fleet, and Edward F. Treadwell, for Respondent. Robertson T. McKisick, Amicus Curiæ, also for Respondent.

ANGELLOTTI, J.—This is an action brought under the provisions of an act entitled "An act authorizing suits against the state on claims or demands arising under an act of the legislature entitled an act fixing a bounty on coyote scalps, approved March 31st, 1891, and regulating the procedure therein." (Stats. 1901, p. 646.)

The act of March 31, 1891, (Stats. 1891, p. 280,) provided that a bounty of five dollars should be paid from the general fund of the state to each person who should kill and destroy any coyote or coyotes in any county of the state for each coyote so destroyed, and contained various provisions as to

the proofs of killing required and the manner of collection of the bounty. This act was repealed by an act approved January 24, 1895, (Stats. 1895, p. 1.) In the mean time many claims for bounties under this act had been made, some of which were paid by the state controller upon the certificates of clerks of boards of supervisors of various counties, as provided in the act. It was then determined by this court in the case of *Ingram* v. *Colgan*, 106 Cal. 113,[1] that the Bounty Act was not in conflict with any constitutional provision, but that, notwithstanding the language of the act as to the drawing of a warrant by the controller, there was nothing in the act exempting the claims from the provisions of section 672 of the Political Code, and that such warrants could not therefore be drawn until the claims had been approved by the state board of examiners. Upon rehearing it was further held that the Bounty Act did not make any specific appropriation out of the general fund for the payment of any of these claims, inasmuch as it failed to designate the amount thereof that could be so used. There being no specific appropriation, the claims could not be paid until an appropriation should be made. (Const., art. IV, sec. 22; Pol. Code, sec. 433, subd. 17.)

It is stated in respondent's brief that under the Bounty Act certificates aggregating in amount $475,100 were issued, of which $187,485 was paid by the controller and treasurer prior to the decision in *Ingram* v. *Colgan*, 106 Cal. 113.[1]

It is further stated that succeeding legislatures passed acts appropriating money to pay the remaining $287,615, but that said acts failed to obtain executive approval.

On March 23, 1901, the act authorizing suits against the state on such claims was approved. By this act it was provided that "the owners or holders of claims or demands against this state" arising under the Bounty Act might, within twelve months from the passage of the act, bring suit thereon and prosecute the same to final judgment; that the rules of practice in civil cases should apply to such suits, except as otherwise provided in the act, with the right of appeal to either party; that the summons should be served on the attorney-general, who should defend on behalf of the state; that the place of trial, upon the demand of the attorney-general, should be changed to the county of Sacramento; that

[1] 46 Am. St. Rep. 221.

all costs in such action should be paid by the plaintiff, and
any judgment should be for the amount actually due, without
costs and without interest, and that such judgment should
not bear interest; and that the attorney-general should report
all final judgments recovered against the state to the legis-
lature.

This action was brought by the plaintiff, claiming to be
the assignee of many such claims or demands, the complaint
containing eight hundred and ninety-two counts on as many
claims, the aggregate amount thereof being alleged to be
$72,330.

The first count substantially alleged that after March 31,
1891, and within three months prior to the presentation
of the scalps and affidavits required by the Bounty Act
to the clerk of the board of supervisors, James Ben killed
and destroyed fifty coyotes in the county of Merced, state
of California, that he thereafter went before a person author-
ized to administer oaths and presented the scalps of said
coyotes, containing the ears and noses thereof, to such officer,
and made the affidavit prescribed by law, showing the time
and place that such animals were killed, and thereafter de-
posited such scalps and affidavit with the clerk of the board
of supervisors; that thereafter, on or about October 3, 1894,
the board of supervisors did determine the number of scalps
so deposited by said Ben with the clerk of said board as afore-
said during the preceding quarter to be fifty scalps, and did
give to him a certificate certified by its clerk, showing the said
number of scalps so deposited by him and the sum due him
therefor at the rate of five dollars for each scalp,—to wit,
two hundred and fifty dollars; that thereafter, the said cer-
tificate and claim or demand were assigned to plaintiff, and
no part thereof has been paid.

The other counts were in all particulars the same as this,
except as to the county, date of determination by the board
of supervisors, number of scalps, amount due, and person
to whom due.

The trial court found in plaintiff's favor upon most of
the counts, giving him judgment for $59,680, without interest
or costs. The state appeals from this judgment in favor of
plaintiff, and from an order denying its motion for a new trial.

1. One of the principal questions presented by these ap-

peals is as to the effect of the certificates issued to claimants under the provisions of the Bounty Act of 1891. Upon the trial of the case the only evidence offered by plaintiff to support the allegations of the complaint as to the killing of the coyotes within the state, the presentation of the claims therefor within the proper time and in the proper manner, and the action of the boards of supervisors thereon, consisted of such certificates. These certificates were objected to as inadmissible for any purpose. The certificates having been admitted in evidence over such objection, the plaintiff, having introduced evidence as to the assignment of the claims to him, rested.

A motion for nonsuit was made and denied, and defendant offered no testimony to rebut that of plaintiff.

It was substantially provided in the Bounty Act of 1891 that the person killing a coyote should present the scalp, containing the ears and nose of the animal, before some person authorized to administer oaths, and make and subscribe an affidavit before such person showing the time and place that the animal was killed, and within three months from the date of the killing deposit such scalp and affidavit with the clerk of the board of supervisors of the county in which the animal was killed. It was further provided that "The board of supervisors . . . shall, quarterly, determine the number of scalps deposited with the clerk of such board during the preceding quarter, and by whom, and shall give to each person who may have deposited scalps a certificate certified by its clerk, showing the number of scalps deposited by such person and the sum due him at the rate of five dollars for each scalp. Such certificate may be presented to the controller of state, who may draw his warrant on the general fund in the state treasury for the sum named therein, in favor of the person entitled thereto."

It was further provided that when the certificate is directed to be drawn, the board of supervisors "shall, at the same time, cause the scalps to be destroyed by fire."

It will thus be seen that the certificate issued by the board was to at least take the place of the scalps deposited by the claimant. While under the decision of *Ingram* v. *Colgan,* 106 Cal. 113,[1] the act must be construed as not authorizing

[1] 46 Am. St. Rep. 221.

the drawing of a warrant by the controller until the claim
had been approved by the state board of examiners, it appears
to us to have been clearly the intent of the act that the officers
auditing and allowing the claim and drawing the warrant
therefor on the state treasurer might act upon the certificate
thus issued by the board. The board of examiners might hear
additional evidence, but it could allow the claim upon the
certificate alone. The deposit of the scalp of a coyote with
the clerk of the board of supervisors, accompanied by an
affidavit showing the killing of the animal within the county
within three months prior to the presentation of the scalp,
was evidently considered by the legislature, which had full
power to determine what should be sufficient proof, to be
sufficient proof of the genuineness of the claim. The pro-
vision of the act to the effect that the supervisors should
"determine the number of scalps deposited," etc., necessarily
means that they must determine the number deposited in ac-
cordance with the provisions of the act,—viz., those deposited,
with a proper affidavit showing that the animals were killed
within the county within three months prior to the presenta-
tion of the scalps. The certificate was to be issued only upon
the determination of the supervisors as to such deposit of
the scalps, accompanied by a proper affidavit, and could have
been intended for no other purpose than to constitute evidence
of such determination. Upon it, at any rate, we are satisfied
the auditing officers were authorized to act. While it may
be freely conceded that the system for proving the genuineness
of the claims was not so perfect as to prevent the consumma-
tion of fraud, it must be acknowledged that it was for the
legislature to determine the procedure to be followed, and
the method adopted was certainly as well designed to safe-
guard the public treasury as were those adopted in Iowa and
Florida and referred to in the cases of *Murray* v. *Jones County,*
72 Iowa, 286, and *Johns* v. *County Commrs.,* 28 Fla. 626.

The claimants having furnished the certificates showing
their compliance with the provisions as to proof of their
claims, and thus having made at least *prima facie* proof of
their claims, the legislature, six years thereafter, enacted the
law under which this action was brought.

In enacting this law the legislature was acting with full
knowledge of the existing condition. It had been made known

through the messages of at least two governors that claims
to the extent of $287,615, supported by the requisite *prima
facie* proof, had been presented to the board of examiners.
It had been suggested therein that frauds had been per-
petrated in the presentation and manipulation of some of
these claims, and it had been recommended by Governor Budd
that a clause should be inserted in any appropriation bill
that might be passed for the payment of these claims to be
effect that the board of examiners might take such evidence
"as it deems necessary" as to the validity of such claims.
Instead of following this suggestion, the legislature of 1901
enacted the law authorizing actions on such claims. We en-
tirely agree with counsel for the state that the manifest
object of this act was to put the courts in the place of the
auditing board of the state. With their greater facilities for
procuring evidence, it was deemed that therein the state could,
with the assistance of its attorney-general, produce such evi-
dence as might be available to show that some of the claims
were, as had been suggested, fraudulent. The legislature must
be deemed to have acted with reference to the peculiar circum-
stances of the case; and it would not be a reasonable construc-
tion of their action taken in favor of the interest of these
claimants to hold that such action contemplated the relega-
tion of "the owners or holders" of the claims from a class
of creditors that had made a *prima facie* showing of the
validity thereof to a position where they would be compelled
to commence at the beginning and make again the showing
that they had already made. It is to be observed in this
connection that the practical effect of the construction con-
tended for by appellant would be to render the act worthless
to many owners of just claims. The individual claims were
mostly for small amounts, the actions, on demand of the state,
were to be tried in Sacramento County, and the costs were to
be borne by the claimants. Aside from the fact that it would
be impossible to procure the evidence as to many such claims,
owing to the death of the original claimants, it would where
such testimony was available, in most cases, cost more to
take such evidence to Sacramento County than the claims
amounted to. The legislature was providing a method by
which the holders of these certificates might collect the
amounts shown thereby to be due, and it was intended that

the certificates should have the same legal effect before the courts that they would have had before the board of examiners, and that, in *the absence of any showing by the state as to the validity of the claim,* they should constitute sufficient evidence to warrant a judgment.

It is suggested that the certificates introduced in evidence were not the certificates of the boards of supervisors, but simply those of the clerks of such boards, and that there is no proper evidence of the action of the boards of supervisors. The certificate set forth in the record was made by "J. G. Elliott, clerk of the board· of supervisors of the county of Merced, state of California," and he certifies that he makes it "pursuant to the order of said board, passed on the 3d day of October, 1894." By order of said board, he certifies that James Ben has deposited with him, as such clerk, during the quarter ending September 30, 1894, fifty coyote scalps, each containing the nose and ears, and that there is due Ben from the state the sum of two hundred and fifty dollars. This certificate substantially complied with the act of 1891, which required the board of supervisors to give "a certificate certified by its clerk," and sufficiently shows a determination by the board as to the deposit of the scalps, accompanied by a legal showing.

The repeal of the act of 1891 did not destroy the effect of the certificate as to the claims which had already accrued. It simply prevented the creation of any further claims against the state for the killing of coyotes. Conceding the power of the legislature to prescribe such further proofs as to the validity of such accrued claims as it deemed proper, we find no intent to so do either in the repeal of the act of 1891 or in the act of 1901 authorizing suits on these claims.

We have considered the other points made relative to these certificates, and are of the opinion that the trial court did not err in admitting them in evidence, or in holding them to be sufficient, in the absence of any counter showing, to warrant a finding as to the validity of the claims.

2. It is further contended that the plaintiff did not show that he was the owner of the claims. In the first place, it is urged that prior to the act of 1901, authorizing suits thereon, the claims were not assignable at all, for the reason that they could not be enforced by judicial proceeding. This con-

tention assumes that action thereon could not have been maintained under the general act of 1893 authorizing suits against the state. We regard it as entirely immaterial, in this connection, however, whether or not they were enforceable prior to the act of 1901.

If not enforceable by judicial proceeding, it was solely because they were claims against the sovereign state, which could not be sued without its permission. They were claims for a bounty, the right to which had become vested by a compliance with the provisions of the statute offering the bounty. The bounty had been earned, and the state was in the same position that any other debtor would be, except that, by reason of its sovereignty, and the absence of any appropriation for the payment of the claims, the creditors were necessarily dependent upon the state making such arrangement as it would for the discharge of its obligations.

We are satisfied that such claims against the state constituted property capable of assignment.

The language of the act of 1901, authorizing "the owners or holders of claims or demands" to bring suit thereon, clearly indicates that it was in the contemplation of the legislature that assignees of such claims might bring suit thereon.

It is also urged that the claims were never in fact assigned.

It appears that plaintiff was the assignee of the Kern Valley Bank, David Hirshfield, and C. Cohn, who had, by a written instrument, assigned to him all their right, title, and interest in said claims. The question is as to the assignment by the original claimants to the Kern Valley Bank and to said Cohn and Hirshfield. The undisputed evidence was that the Kern Valley Bank had prior to the act of 1901 purchased directly from the original claimants a large number of these claims in suit, and Cohn and Hirshfield had purchased the remaining claims in suit, the purchase price in each instance being paid in cash by the purchaser. The transactions between the original claimants and the purchasers were not evidenced by any writing, except the powers of attorney or authorizations for deposit with the state controller and state treasurer, ordinarily used in the collection of amounts due from the state by both agents and assignees. These designated the purchasers as the attorneys of the claimants to receive the warrants from the controller and the money from the treasurer,

and were signed by the claimants. The transaction between the claimant and the purchaser in each case consisted of the delivery by the claimant to the purchaser of the certificate, and the signing and delivering of the power of attorney, and the payment in cash, at the time of the purchase, by the purchaser to the claimant, of the purchase price agreed on.

It is suggested that these claims could not be transferred by parol, but we are not referred to any provision of our statute that makes a writing essential to the validity of a sale made under the circumstances here shown. "A transfer may be made without writing in every case in which a writing is not expressly required by statute." (Civ. Code, sec. 1052.)

It is urged that since powers of attorney were given at the time of the transaction, the agreements between the claimants and the alleged assignees were evidenced by writing, which alone can be looked to for the terms of the agreement, and that the parol testimony as to a purchase was not admissible, for to admit it would be to allow parol testimony to vary the terms of written agreements.

The rule contended for has no place except between the parties to the agreement and their representatives and successors in interest. It cannot be invoked by strangers to the agreement. (Code Civ. Proc., sec. 1856; *Dunn* v. *Price,* 112 Cal. 46, 51.) There is, however, nothing in the parol evidence that is inconsistent with the instruments designated as "powers of attorney." They did not purport to express the agreement between the parties, had nothing to do with the sales thereunder, and were mere directions to the state controller and state treasurer, without which the purchasers could not obtain from the officers of the state the proceeds of the property which they had purchased. They were entirely consistent with the fact of purchase shown by the parol testimony.

The evidence in relation to the assignments was sufficient to warrant the findings thereon made by the trial court.

3. It is contended that the action is barred by section 2 of the general act authorizing suits against the state. (Stats. 1893, p. 57.) This defense was not specially presented either by demurrer or answer, and there is no finding thereon, but it is urged that in the case of the state the benefit of the statute of limitations cannot be waived by the officers representing

the state. We do not, however, deem it necessary to discuss the question as to the effect of the failure to plead the statute.

The two-year limitation fixed by the act of 1893 applies only to actions brought under the provisions of the act of 1893. This action was brought under the act of 1901, which prescribed its own statute of limitations,—viz., "twelve months from the passage of this act." The intent of the legislature of the state to waive the benefit of any defense of limitation it may have had, under section 2 of the act of 1893, against these claims is manifest. Otherwise, the act of 1901 authorizing the institution of these suits and the prosecution of the same to final judgment would be of no avail, for at the time of its enactment the period of limitation prescribed by the act of 1893 had long since expired as to the great mass of the claimants,—viz., as to all except minors, insane persons, persons imprisoned on a criminal charge or judgment pronounced thereon, married women, and incompetent persons. Unless it clearly appear to the contrary, it cannot be held that the legislature intended its act to be a mere form without beneficial purpose. When it said that any owner or holder of any of these claims might, *within twelve months from the passage of the act,* bring his suit, it said that any suit so brought would be within time and free from any defense of limitations.

This construction, it is urged, would render the law obnoxious to the provisions of section 31 of article IV of the constitution, prohibiting the legislature from making any gift of public money or thing of value, the contention being that a waiver of the defense of limitations is a gift within the meaning of such provisions.

The statute of limitations does not, however, go to the substance of the right, but only to the remedy. When the statute has made the defense available to the debtor, his debt has not been extinguished. It still exists, and may be enforced against him unless he chooses to avail himself of the defense afforded by the statute and specially plead it. The payment of such a debt by the debtor is not a "gift," in any proper sense of the word, and there is nothing in the constitutional provision invoked that can be held to prohibit the legislature from paying these claims.

4. We are of the opinion that it was not essential to a statement of a cause of action in a suit brought under the act of 1901 that the complaint should allege a presentation of the claims to the state board of examiners.

5. It is contended that the findings are contradictory, in that the court found that all the facts set forth in the complaint are true except the allegation as to certain specified counts, and at the same time found that none of the facts set forth in the answer are true. The answer was a specific denial of the allegations as to each of the eight hundred and ninety-two counts. If it be conceded that these findings are at all in conflict, it is apparent from the transcript on appeal that, so far as the specified counts were concerned, no judgment was given in favor of plaintiff, and that as to them defendants prevailed. As already stated, but one count is set forth in the copy of the complaint contained in the transcript, the others having been omitted by stipulation of the parties. In place of such counts there has been inserted a statement that the aggregate amount of all the counts was $72,330, and that the aggregate amount of all others than those specially mentioned in the decision was $59,680, for which latter amount judgment was ordered by the court and entered. In view of the stipulation of the parties, we are entitled to look at this statement, and it is demonstrated thereby that judgment was given for plaintiff only upon the counts not specially mentioned in the decision. Any conflict in the findings as to the specified counts is therefore immaterial on defendant's appeal.

What has been said disposes of all the points made by the state, except those relative to the constitutionality of the original Bounty Act of 1891 and the act of 1901, authorizing suits on the claims arising thereunder.

There is nothing in the contention that the act of 1901 is invalid under the provisions of our constitution relative to special legislation. Conceding for the moment the constitutionality of the original act of 1891, the legislature had the right to provide whatever method it deemed proper for the proof of the claims arising thereunder and the payment of the same. It could without further investigation have appropriated the money to pay those who had made the showing required by such act, or it could provide for such investiga-

tion as was by it deemed essential to a proper determination of the question as to the justness of the individual claims against the state. What has already been said in regard to the claims under this act amply shows that these bounty claimants constituted a class characterized by such substantial qualities and attributes as to render appropriate legislation peculiar to itself, in the matter of the determination of the validity and payment of the claims.

We have already disposed of the objection that the act of 1901 is obnoxious to section 31 of article IV of the constitution, prohibiting the legislature from making any gift.

There remains only the objection that the Bounty Act of 1891 was invalid under the provisions of section 1 of article XVI of the constitution, which provides as follows, viz.: "The legislature shall not, in any manner, create any debt or debts, liability or liabilities, which shall, singly or in the aggregate with any previous debts or liabilities, exceed the sum of three hundred thousand dollars, except in case of war to repel invasion or suppress insurrection, unless the same shall be authorized by law for some single object or work to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, for the payment of the interest of such debt or liability as it falls due, and also to pay and discharge the principal of such debt or liability within twenty years of the time of the contracting thereof, and shall be irrepealable until the principal and interest thereon shall be paid and discharged; but no such law shall take effect until, at a general election, it shall have been submitted to the people and shall have received a majority of all the votes cast for and against it at such election."

This point was made by the attorney-general in his briefs in the case of *Ingram* v. *Colgan,* 106 Cal. 113,[1] but although the act under consideration was there held to be free from constitutional objection, no reference was made in the opinion to this contention.

It appears from the report of the state treasurer for the year ending June 30, 1890, that the total bonded indebtedness of the state at that date was $2,642,000. What is also styled in the report a debt of the state consisted of controller's warrants aggregating $173,295.10, which, it must be assumed,

[1] 46 Am. St. Rep. 221.

had been drawn upon unexhausted specific appropriations
provided by law to meet the same.   An examination of the
same report shows that there were in the various funds so
drawn upon amounts in excess of the sums necessary to pay
the warrants.

It does not appear that any of the liabilities for which
these warrants were drawn had been created by the legisla-
ture without provision made at the same time by appropriation
from the current revenue for the payment of the same, and
they were therefore not debts, within the meaning of the
prohibitory clause of the constitution.   This matter is fully
and ably discussed in the opinion in *People* v. *Pacheco,* 27
Cal. 175, and the cases there cited.  Of the bonded debt, which,
so far as appears, constituted the only indebtedness of the
state at that time, all but five thousand dollars—to wit,
$2,637,000—was evidenced by the funded debt bonds, issued
under the act of April 2, 1870, (Stats. 1869-1870, p. 646,) and
the issuance of these bonds had been authorized by a vote of
the people of the state at a general election.

This left, at most, an indebtedness of only five thousand
dollars, created solely by the legislature.

It seems very clear to us that such debts and liabilities as
had been authorized by the people of the state at a general
election, in the manner provided by the constitutional pro-
vision invoked by appellant, cannot be taken into considera-
tion in determining the question as to the power of the
legislature to itself create an indebtedness.   The section was
not designed to limit the amount of indebtedness that might
be created by the *state,* for under its express provisions an
indebtedness may be created for any amount, and there is no
other provision in the constitution prescribing a limit of aggre-
gate indebtedness.   The section goes entirely to the manner
of the creation of indebtedness.   It was recognized that with-
out some such provision the legislative department might at
will create indebtedness to any amount, and it was thought
that some limit should be placed upon this power.   The lan-
guage used indicates the intention and object of this provision
very clearly, which was simply to put a limit upon the amount
of indebtedness that might at any time be created by the
legislature itself.   That body was to have power to create
debts to the extent of three hundred thousand dollars only.

The indebtedness created by the legislature itself must at no time exceed three hundred thousand dollars. It was deemed proper that the legislature should have the power at all times to go to this extent, because of possible needs of the state government. If any further indebtedness became necessary, the people must authorize it by their votes at a general election, but an indebtedness so authorized became in effect one created by the people, and one excluded from the category of debts created by the legislature, within the meaning of this constitutional provision. So far as is material here, the section, in effect, simply provides that the legislature shall not, in any manner, create any debt or liability which shall, singly or in the aggregate, with any previous existing debts or liabilities created by the legislature, exceed the sum of three hundred thousand dollars.

The decisions in the cases of *People* v. *Johnson,* 6 Cal. 499, and *Nougues* v. *Douglass,* 7 Cal. 65, relied on by the appellant, are not in conflict with the views here expressed. It appeared in the case of *People* v. *Johnson* that the previous indebtedness, exceeding one million dollars, had never been submitted to and ratified by a vote of the people, as required by the constitution, and was purely a debt attempted to be created by the legislature. The same condition undoubtedly existed in *Nougues* v. *Douglass,* 7 Cal. 65.

At the date of the passage of the Bounty Act of 1891 the indebtedness created by the legislature did not, so far as appears, exceed five thousand dollars. The legislature still had the power to create a further indebtedness of two hundred and ninety-five thousand dollars. The act of 1891, which provided for a bounty of five dollars for each coyote destroyed, to be paid to the person destroying it, did not of itself create any debt or liability. It was simply an offer upon condition, and only upon the performance of the condition by any person could a debt or liability arise on the part of the state. Upon such performance, however, by any person, the amount specified in the act—viz., five dollars for each coyote killed by him in accordance with the provisions of the act—would become due such person from the state, and, no appropriation having been provided to meet the claim, such amount would be a debt created by the legislature within the meaning of the constitutional provision. But the amounts which might become due

to persons under the terms of said act would not necessarily exceed two hundred and ninety-five thousand dollars. The act could not, therefore, be held upon its face to violate the constitutional provision. The legislature had the power to create indebtedness to the extent of three hundred thousand dollars. The mere fact that the total amount that would ultimately be paid under the act was not named, and that under its terms, in the course of years, claims might possibly accrue and remain unpaid that, with other debts, would exceed the constitutional limit, would not affect the question as to the constitutionality of the *act*. The only possible effect of the constitutional provision in such a case would be to render void, as beyond the power of the legislature, any *indebtedness* incurred *in excess of the constitutional limit*.

Whether or not the indebtedness adjudged to be due to plaintiff—viz., $59,680—was, in whole or in part, incurred in excess of this limit is a question not presented by the record in this case. There is no issue relative thereto made by the pleadings, and no finding made by the court, and it is impossible for us to say from the evidence in the record or from anything contained in the briefs that the claims held by plaintiff did not entirely accrue before the aggregate amount of valid claims presented under the act had reached the sum of two hundred and ninety-five thousand dollars.

It is, however, stated that the aggregate amount of unpaid claims against the state arising under this act was $287,615, and that suits were instituted under the act of 1891 for only $224,345, and that the judgments entered were for an aggregate of only $175,000. These amounts were all within the constitutional limit of indebtedness.

It is further stated, however, that prior to the presentation of any of these claims, and, so far as appears, prior to the accrual thereof as debts against the state, the state officers had paid $187,485 on prior claims accruing under the act of 1891. These claims should not have been paid without prior appropriation (*Ingram* v. *Colgan,* 106 Cal. 113[1]), but, nevertheless, being in fact paid, they no longer constituted a part of the indebtedness of the state, and cannot be taken into consideration in determining the question as to the validity of claims subsequently accruing.

[1] 46 Am. St. Rep. 221.

The judgment in favor of plaintiff and the order are affirmed.

Van Dyke, J., Shaw, J., McFarland, J., Lorigan, J., and Henshaw, J., concurred.

Beatty, C. J., deeming himself disqualified, did not participate.