## *In re* APPLICATION OF STATE TO ISSUE BONDS TO FUND INDEBTEDNESS.

No. 5663.   Opinion Filed November 22, 1913.

(136 Pac. 1104.)

1. **APPEAL AND ERROR**—Law of the Case—Subsequent Appeal. Decisions of appellate courts of this state, upon all questions of law involved in any case, are binding, not only on the lower court, but on the appellate court as well, in case of a subsequent appeal.

2. **SAME.** No different rule of construction will be applied to a proceeding under the statute to procure the issuance of funding

bonds, where a protest or remonstrance is filed thereto, and issues thus framed, from that to be applied in ordinary cases.

3. STATUTES—Repeal—Effect on Pending Action. The omission of sections 372 to 381, Compiled Laws of 1909, from the Revised Laws of 1910 does not operate to abate a proceeding pending under said sections prior to the date when said Revised Laws of 1910 went into effect.

(Syllabus by the Court.)

Robertson, Special Justice, dissenting.

*Error from District Court, Oklahoma County; John J. Carney, Judge.*

Application by the State, acting by and through its Governor, Secretary of State, and State Treasurer, to determine the existence, character, and amount of its outstanding indebtedness, and to issue bonds to refund the same, and certain citizens appear and file a protest against the issuance of the bonds. Judgment was entered approving the bond issue, and certain protestants bring error. Affirmed.

See, also, 33 Okla. 797, 127 Pac. 1065.

*C. W. Stringer,* for plaintiffs in error.

*Charles West,* Atty. Gen., for defendant in error.

CAMPBELL, Special Justice. This is a proceeding instituted in the district court of Oklahoma county, by the Governor, Secretary of State, and State Treasurer, for the purpose of determining the existence, character, and amount of the legal outstanding warrant indebtedness of the state, and causing a statement thereof to be entered upon the records of the court, and to authorize and direct the issuance of funding bonds of the state, under the provisions of sections 372 to 381, inclusive, of Compiled Laws 1909. The proceeding was filed and notice given as required by statute, and certain citizens of the state appeared and filed protests against the issuance of the bonds. The trial court, originally treating such protests as demurrers to the application or petition, sustained the same. From the judgment, an appeal was taken to this court, and here the judgment of the trial court sustaining such demurrers was reversed, and

the cause remanded for further proceedings; the opinion in the former appeal being reported in 33 Okla. 797, 127 Pac. 1065. After the case was remanded, the district court again heard and considered the matter, evidence being introduced in support of the application or petition. Judgment was duly entered, directing the issuance of fundings bonds in the sum of $2,907,122.19. A motion for new trial was filed and by the court overruled, and the case is again brought here on appeal by the parties filing one of the remonstrances or protests in the trial court. At the last hearing in the trial court, the officers of the state, making the application through the Attorney General, were permitted to amend the application by striking from the schedule of warrants originally submitted for funding certain warrants aggregating $34,042.32, and by adding to said schedule certain other warrants not originally listed, and amounting to $45,214.82, together with certain interest that had accrued upon the warrants as originally listed in the application filed. The case was tried in the lower court upon an agreed statement of facts and certain evidence introduced in open court, from all of which the trial court found that the total amount of outstanding indebtedness for the fiscal year ending June 30, 1911, would amount, on the 1st day of October, 1913, over and above the funds on hand to pay the same, to $2,907,122.19.

It becomes important, at the outset, to determine just how far the decision of this case on this appeal is to be controlled by the decision on the previous appeal.

For convenience, we shall refer to the plaintiffs in error as the protestants.

The contention is made that the decision on the former appeal is not binding now on the court. This contention is based, in part, upon the argument that the case presents, not the elements of litigated rights, but is merely an *ex parte* proceeding on the part of the state, acting by certain of its officers, and that the duty of the court is largely ministerial, having some relation to the duty of an auditor of the claims sought to be funded. This position, in our judgment, is not sound. It is true, the controversy arose upon the application of the state for

the determination of its outstanding indebtedness as a basis for issuing the bonds required to take up and cancel the warrants. No one was required by law to be personally served, or to answer the application, or to protest against the procedure in any way, and if no one had appeared within the time fixed by law and stated in the publication notice, it would not have been a technical default, and the proceeding would have been, in that case, largely in the nature of an *ex parte* hearing. But persons interested have the right, under the statute, to be present. The statute does not say in express terms that interested persons have the right to be heard by any form of pleading in opposition to the issuance of the bonds as sought. The protestants, however, appeared and filed their pleading, and the trial court rightly, we think, entertained and passed on the matters put in issue thereby. As we view it, the proceeding, both in form and substance, possessed, from the time such pleading by protestants was filed, the essential characteristics and elements of an ordinary suit between contending parties; it presented a real controversy, and one of much importance, not only to the parties actually before the court, but to the whole state as well, and to the holders of the warrants for which the funding bonds were sought to be issued.

But, even if it be granted that the proceeding was *ex parte* the state, by its officers, as contended, no good reason, in fact no reason at all, is suggested why the application of the doctrine of the "law of the case" should be different therein from its application in an ordinary controverted law suit. No reason for applying a different rule in those *ex parte* matters which the courts are sometimes called upon by the law to pronounce judgment in occurs to us. On the contrary, it would seem of equal, if not greater, importance that, where the decisions and actions of ministerial or executive officers are required to be reviewed by the courts, and the judgment of the courts expressed upon the regularity and validity of such ministerial or executive decisions and actions before finally in force, such judgments, when once solemnly given, should be final and conclusive to the same extent that any other judgment is. If this were not so, a judg-

ment reversing the lower court in a matter of the character stated would furnish no standard for the conduct of the proceedings before the trial court after remand, and the officers of the state, after procuring judgment of the court of last resort, would find themselves, in subseqeunt stages of the action, right where they started.

It is the rule of this state that the decisions of appellate courts upon all questions of law involved in any case are binding, not only on the lower court, but on the appellate court as well, in case of a subsequent appeal. *Atchison, Topeka & Santa Fe Ry. Co. v. Baker,* 37 Okla. 48, 130 Pac. 577; *Oklahoma Gas & Electric Co. v. Baumhoff,* 21 Okla. 503, 96 Pac. 758; *Chicago, R. I. & Pac. Ry. Co. v. Broe,* 23 Okla. 396, 100 Pac. 523; *Harding v. Gillett,* 25 Okla. 199, 107 Pac. 665; *State Bank of Waterloo v. Citizens' National Bank,* 26 Okla. 801, 110 Pac. 910; *First National Bank of Claremore v. C. M. Keys et al.,* 27 Okla. 704, 113 Pac. 715; *Harper v. Kelly,* 29 Okla. 809, 120 Pac. 293; *Harsha v. Richardson,* 33 Okla. 108, 125 Pac. 34. This rule is in harmony with authority from other jurisdictions, and seems, in fact, not to be seriously questioned anywhere. *Terre Haute v. Baker,* 4 Ind. App. 66, 30 N. E. 431; *Heidt v. Minor,* 113 Cal. 385, 45 Pac. 700; *City of Hastings v. Foxworthy,* 45 Neb. 676, 63 N. W. 955, 34 L. R. A. 321; *Standard Sewing Machine Co. v. Leslie,* 118 Fed. 557, 55 C. C. A. 323; *McKinney v. State,* 117 Ind. 26, 19 N. E. 613; *Wilson v. Binford,* 81 Ind. 588.

The rule as stated, however, is subject to the exception that if, to follow the former decision would work gross or manifest injustice, it should be overruled. *A., T. & S. F. Ry. Co. v. Baker, supra; Okla. G. & E. Co. v. Baumhoff,* 21 Okla. 503, 96 Pac. 758.

It follows that, unless gross or manifest injustice will result from allowing the former decision in this case to stand, that decision, in so far as it is applicable to the questions raised on the present appeal, will be treated as binding. The former decision was handed down on November 15, 1912, and we believe any lawyer, after an examination thereof, would be justified in advising his client that the warrants herein sought to be funded

constitute a safe investment, and that it is not the policy of this state to allow its just obligations, contracted for necessary expenses of government, at any time to be dishonored. Confidence in the integrity of the state's obligations is a necessary conclusion from the opinion, as written, and that the business world has, to some extent, acted on that decision is, we think, a perfectly legitimate inference. If any person or concern has extended credit to the state for its current needs, or purchased any of these warrants in reliance upon the assurance that the law of the state would not permit the repudiation of such obligations, such person or concern would be injured by overruling the decision which fixed the law. In such a case the exact converse of the exception to the rule for application of "the law of the case," as above stated, would appear. We recognize fully that to issue these bonds will place upon the people the burden of some $3,000,000, with interest, to be paid by taxation. Still it is shown, and in fact conceded, that the people who must pay this sum have received its equivalent in services and supplies actually necessary to the maintenance and conduct of the business of government—without which the state government could not be carried on at all. These warrants paid the officers, cared for the convicts, paid for food and clothing and treatment for the insane. These things have to be paid for from day to day, if the business of organized government is to continue, and there come times when only the stability of state credit will purchase supplies and procure the services necessary to their performance. We do not regard it as a gross or manifest injustice to the parties prosecuting this appeal to require them and their property and their posterity to pay a share of the burden thus created. That the warrants in question are evidence of obligations, sound in every moral regard, is conceded here. The very foundation of the law is found in good morals, and it would do no violence to correct legal interpretation, in case of conflict between law and morals, to require the former to yield to the latter. The moral code is the foundation of the proper legal code, and the ideal system will never be reached until

every expression of the law finds its response in sound moral principles.

The persons resisting the issuance of these bonds are, in a sense, representatives of the citizens of the state, for the decision here reached will affect all the people alike. We are not unmindful of the vast importance of the correct interpretation by the courts of the fundamental law, but we see nothing in the former decision that does violence to the safeguards the makers of the Constitution sought to throw around the people in the administration of public affairs. Treating the state as an individual, it is required, by the construction given in the former decision, to meet the necessary demands of its existence, and no more. There is nothing in that opinion that would form even an excuse on the part of the state's ministerial and executive agents for the exploitation of the people by expenditures, without their consent, of money for any enterprise in which said agents might conceive the state to be interested, and by following that interpretation we do not mean to furnish such an excuse.

Seeing no reason in this case to depart from the wise rule of construction stated, we declare here that it is the duty of the court, in disposing of the appeal, to apply the law as laid down in the former decision, so far as that decision adjudicates the questions now before the court. In doing this, it is not necessary to discuss again the reason or the authorities by which a majority of the court was controlled in reaching the conclusions set forth in the former opinion. It is necessary, however, to apply the law as stated therein, and determine just how far it controls the controversy in its present state. It is interesting to note, since the former appeal in this case was decided, practically the same question, though arising in a little different manner, was before the Court of Appeals of the state of Kentucky in the case of *Rhea v. Newman,* 53 Ky. 604, 156 S. W. 154, in a proceeding involving the expenditure of moneys by the state, and the same conclusion was reached as in the former decision by this court.

As has been said in the former appeal, the protest filed against the issuance of the bonds was treated as a demurrer.

It was held that the demurrer should have been overruled by the trial court. It becomes pertinent now to inquire whether or not the proceedings in the trial court, after the case was remanded, were in substantial compliance with the law as laid down in the opinion of this court. If so, the trial court's judgment to that extent must be affirmed. *Okla. G. & E. Co. v. Baumhoff*, 21 Okla. 503, 96 Pac. 758.

In pursuance of the order of this court, the trial court treated the petition or application as sufficient under the law, and heard evidence in its support. This evidence, and the stipulations of the parties, show that the warrants sought to be funded by substitution of bonds were largely for services rendered and supplies furnished during the fiscal year ending June 30, 1911, and that all of said warrants were issued against actual existing appropriations. Certain warrants were shown to have been withdrawn from consideration because of doubt as to their validity, but as to this action the protestants have no right to complain. The court did not examine in detail every warrant proposed to be funded, but the evidence introduced was sufficient to support the finding and judgment that all the warrants offered were legal and valid, representing actual obligations of the state.

The proceedings of the state's officers in arranging the funding proceedings, and preparing the requisite preliminaries to the court's action, were shown to have been regular and in substantial compliance with the law. The evidence supports the allegations of the application or petition in every material regard, and is sufficient to sustain the judgment and findings of the trial court.

The first paragraph of the syllabus of the former opinion states the construction given to the section of the Constitution relied on by protestants as follows:

"The limitations of section 23, art. 10, Williams' Ann. Const., Okla., were not intended to apply to that class of pecuniary obligations arising out of the ordinary necessary current expense of maintaining the state government, and which were in good faith intended to be paid, and were lawfully payable, out of the current yearly revenues, and other resources of the

state, for the fiscal year within which such obligations were incurred."   (33 Okla. 797, 127 Pac. 1065.)

It is clear from the record that the warrants in question come within the law as thus stated, and that the bonds should be allowed to issue in the place of such warrants, unless they must be stricken down for some other reason than that they are prohibited by the constitutional provision referred to.   Inasmuch as section 23, article 10, of the Constitution, does not apply to indebtedness incurred for necessary current expenses of state government, it must follow, as a matter of course, that said section does not prohibit the issuance of obligations as evidence of expenses of that character.   We have not overlooked the force of counsel's argument, to the effect that no revenue was in fact provided to meet these warrants, and that as a consequence they are illegal and void, but it would be impossible to uphold that contention in the face of the declaration of law, as stated by the court on the former appeal.   Inasmuch as we now hold that declaration to be binding on the court as the law of the case, it is apparent that the contention made cannot now be upheld.   Indeed, it is frankly contended in the brief on file that this court was in error in holding that the issuance of warrants in excess of $400,000, for the payment of which there were no funds on account of the failure in revenues, was not the creation of indebtedness, within the meaning of section 23, art. 10, of the Constitution.   But a mere error in the holding made by an appellate court is not ground for overruling its decision in the same case on a subsequent appeal.   In the absence of a showing of manifest or gross injustice on the subsequent appeal, such error is immaterial. *Ayer & Lord Tie Co. v. Commonwealth ex rel.* (Ky.) 85 S. W. 1096; *Tool Co. v. Champ Spring Co.*, 146 Mo. App. 1, 123 S. W. 513; *Jacobson v. U. S. Gypsum Co.*, 150 Iowa, 330, 130 N. W. 122; *Schmidt v. Beiseker*, 19 N. D. 35, 120 N. W. 1096; *Jeffrey v. Osborne*, 145 Wis. 351, 129 N. W. 932; *New York Life Ins. Co. v. McIntosh* (Miss.) 46 South. 401; *Baum v. Hartman*, 238 Ill. 519, 87 N. E. 334; *Evans z. Nail*, 7 Ga. App. 129, 66 S. E. 543; *Lewis v. Jones*, 97 Ark. 147, 133 S. W. 596.

154    SUPREME COURT OF OKLAHOMA.

In re Application of State to Issue Bonds to Fund Indebtedness.

Several *"points for reversal not involved in the former appeal"* are urged here. It is contended that the warrants in question are within the inhibition of section 23, art. 10, of the Constitution, and that no revenue has been legally provided with which to meet at least a large portion of such warrants. These contentions are disposed of by the former holding that section 23, art. 10, of the Constitution was not intended to apply to indebtedness of the character under consideration in this proceeding. That being true, there is no constitutional inhibition against the warrants or the bonds sought to be issued in their stead.

The contention that the proof was insufficient to show the validity of the warrants has already been disposed of, and requires no further treatment.

Certain warrants first presented to the lower court were withdrawn or disallowed, and it is contended that the bond issue, as ordered by the trial court, is void for the reason that the bonds do not cover the outstanding indebtedness of the state. Warrants so withdrawn were withdrawn by consent of the court, for the reason they were of doubtful validity. The court's judgment recites that the proof established the total warrant outstanding indebtedness of the state in the amount of the bonds ordered issued. We see no reason why persons not the holders of the warrants omitted or denied should be heard to complain of this finding. Certainly it was the duty of the court not to allow bonds to issue covering illegal or doubtful warrants. It would seem that one of the strongest grounds for requiring the bond issue to be reviewed by the court would be in the nature of a precaution that all warrants of the illegal or doubtful class be eliminated from the bond issue.

The only other contention made that requires consideration is to the effect that the statute under which this proceeding was brought was repealed on May 16, 1913, when the Revised and Annotated Laws of Oklahoma, generally referred to as the Harris-Day Code, took effect, and that such repeal operated to abate the proceeding. Sections 372 and 381 of the Compiled

Laws of 1909 were not brought forward by the Harris-Day Compilation. Section 54, article 5, of the Constitution provides:

"The repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any accrued right, or penalty incurred, or proceedings begun by virtue of such repealed statute."

This is certainly a proceeding begun prior to May 16, 1913. Sections 372 and 381, of the Compiled Laws of 1909, omitted from the Harris-Day Code, specifically gave the state, by its officers, the right to' institute this proceeding, and when the protests or remonstrances were filed, the proceeding took on the nature of a litigated dispute, as has been observed. It affects, not only the immediate parties, but the holders of the warrants and the taxpayers as well, and it appears to be a proceeding begun, saved by the Constitution in the sections just quoted.

The adoption of the Harris-Day Code operated to repeal preexisting sections omitted therefrom, but such repeal does not affect the validity of a proceeding of the character under consideration, as appears from the express terms of the adoption act. The saving provision is found in section 1, chapter 39, Session Laws 1911, the act by which the Harris-Day Code was adopted as the Revised Laws of the state. It is in the following language:

"All general or public laws of the state of Oklahoma not contained in said revision are hereby repealed. Provided, that this act shall not be construed to repeal, or in any way affect any special or local laws, or any appropriation, special election, validating act or bond issue thereby authorized, nor to affect any pending proceeding or any existing rights or remedies, nor the running of the statute of limitations in force at the time of the approval of this act; but all such local and special laws, appropriations, special elections, validating acts, bond issues, pending proceedings, and existing rights and remedies shall continue and exist in all respects as if this act had not been passed; provided, further, that this act shall not be construed to repeal any act of the Legislature enacted subsequent to the adjournment of the extraordinary session of the Legislature which convened in January, 1910.".

This proceeding being one begun prior to the date when the act of adoption went into effect, and being for the purpose of

procuring an issue of bonds, it comes within the letter of the statute, as a proceeding begun and pending, as a necessary step in a bond issue authorized by the omitted act. The bond issue can only be saved by saving the proceeding provided for that purpose. It follows that the proceeding did not abate or become invalid by reason of the repeal of the statute under which it was begun prior to such repeal.

The judgment of the trial court is affirmed.

HAYES, C. J., and KANE and WILLIAMS, JJ., being disqualified, the Governor appointed Messrs. J. B. A. ROBERTSON, P. D. BREWER, and R. M. CAMPBELL to sit in their places in the consideration of this case. TURNER, LOOFBOURROW, and BREWER, JJ., concur. ROBERTSON, J., dissents.

ROBERTSON, Special Justice. I regret exceedingly the necessity that compels me to dissent from the conclusion reached by the other members of this court in this case. But, owing to the importance of the question involved, I feel that I would be remiss in my duty should I fail to express my views. This being a dissenting opinion, I shall be as brief as possible, and will give only a skeleton outline of the reasons which impel me to dissent.

The general rule set out and relied upon in the majority opinion that a decision of an appellate court upon all questions of law involved in any case decided by it is binding, not only upon the lower court thereafter, but upon the appellate court as well, is conceded, and its correctness is not in any wise questioned, but the rule has well-defined exceptions, among which is that, if by following the former decision gross or manifest injustice or wrong should follow, the decision will be ignored and not looked upon or considered as an authority. It is the application of this rule to the present case without regard to the exception noted that causes me to differ with the majority in reference to the conclusion reached by them. Whether by following the opinion in the former case gross injustice, or wrong, would ensue can only be determined by considering the result reached in the

former case, and comparing it with what I conceive should have been the result.

Section 2, art. 10, of the Constitution, reads as follows:

"The Legislature shall provide by law for an annual tax sufficient, with other resources, to defray the estimated ordinary expenses of the state for each fiscal year."

This section of the Constitution has been duly vitalized by proper legislative enactment. Section 7621, Comp. Laws 1909; section 7449, Rev. Laws 1910. The duty of meeting the necessary expenses of maintaining the state government is a solemn and binding one, and the various Legislatures of this state have not evinced any disposition to neglect the same, or to shift that responsibility to other shoulders; indeed the converse seems to be true, as shown by the amounts included in the various appropriation bills which have been enacted since statehood, and of which we take judicial notice. Nor does the necessary expense of maintaining the state government come within the constitutional debt-limiting provision of the Constitution. The framers of our organic law clearly had in mind occasions such as the present, when the regular revenue, on account of failure to collect, or for other reasons, would be insufficient to meet the current obligations of the state, and to obviate any such difficulty they provided by section 3 of article 10 of the Constitution that:

"Whenever the expenses of any fiscal year shall exceed the income, the Legislature may provide for levying a tax for the ensuing fiscal year, which, with other resources, shall be sufficient to pay the deficiency, as well as the estimated ordinary expenses of the state for the ensuing year."

As may be clearly seen, this section confers authority on the legislative branch of government to provide, in addition to the regular levy provided in section 2 of article 10, *supra,* for a sufficient levy to meet such outstanding obligations as may have been brought forward from the preceding year. Section 7621, Comp. Laws 1909 (section 7374, Rev. Laws 1910), shows clearly that the Legislature has fully met the requirements of the Constitution in this respect, and in addition said section provides and makes it the specific duty of certain state officials to ascertain the amount of unpaid expenses for the preceding year, as well

as for the current year, in order that a proper estimate and levy may be made to meet them. The Constitution, however, makes provision for caring for these deficiencies in another way yet; i e., in case the Legislature or the state officials fail or refuse to provide the additional levy mentioned in section 3, art. 10, *supra*. Thus section 23, art. 10, of the Constitution, provides:

"The state may, to meet casual deficits or failure in revenues, or for expenses not provided for, contract debts; but such debts, direct and contingent, singly or in the aggregate, shall not, at any time, exceed four hundred thousand dollars, and the moneys arising from the loans creating such debts shall be applied to the purpose for which they were obtained or to repay the debts so contracted, and to no other purpose whatever."

The debts thus provided for are to meet "casual deficits or failure in revenue or for debts not otherwise provided for," and may be contracted for in such manner as the Legislature may provide by statute. Article 1, chapter 8, Comp. Laws 1909, provides an ample and adequate remedy. The statute last referred to is now in full force and effect. The foregoing section of the Constitution is, without doubt, a limitation of the power of the state to contract debts; "argument cannot take away the forceful meaning of the plain, unequivocal language therein used. If this was the only section of the organic law dealing with the limitation of the power of the state to contract debts, I should, without hesitation, say thus far shall we go and no further." And, as has been well said:

"However great the need for revenues or grave the condition confronting the state, the power to raise revenues is vested in the Legislature and not in the courts; and, if there is no provision of law by which relief may be had from the present situation, then the legislative branch of our state government is confronted with a duty which should be discharged without delay, and without interference from or supervision by the courts."

However, as I view the situation, there are other provisions of the Constitution, though not wholly satisfactory, being fraught with more or less delay and uncertainty, by which it is intended that such contingencies as the present situation may be met. For, as I view the law, while section 23 fixes a definite line of limitation upon the state as to the amount of debt it may contract, such

limitation is intended to apply only to that particular means of incurring the debt; that is, only as a limitation of the amount of debt which may be contracted in this manner, and not as a limitation upon the amount which may be contracted by other means. For in case the necessity arises for the creating of a debt in excess of $400,000, the Constitution provides for the passage of a law creating the debt, and providing the means of payment, by the Legislature.

Section 25, art. 10, of the Constitution, provides:

"Except the debts specified in sections twenty-three and twenty-four of this article, no debts shall be hereafter contracted by or on behalf of this state, unless such debt shall be authorized by law for some work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax to pay, and sufficient to pay, the interest on such debt as it falls due and also to pay and discharge the principal of such debt within twenty-five years from the time of the contracting thereof. No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election. On the final passage of such bill in either House of the Legislature, the question shall be taken by yeas and nays, to be duly entered on the journals thereof, and shall be: 'Shall this bill pass, and ought the same to receive the sanction of the people?'"

Thus is seen by the foregoing section that provisions are made for every kind of debt except those mentioned in sections 23 and 24. Section 23 gives authority for the state to contract debts to the amount of $400,000, to meet casual deficits, or failure of revenues, or expenses not otherwise provided for, and section 24 authorizes the state to contract debts without limit for the purpose of defraying expenses incident to war, repel invasion, and suppress insurrection. With exception of the debts mentioned in these two sections, section 25 reserves to the people alone the power to create debts. Is it for the courts to say that this is a just and proper provision? Shall the courts prevent the exercise of this power by the usurpation of legislative functions? Shall the judicial arm of government, on the ground of expediency alone, usurp the prerogatives of the Legislature,

or take from the people the rights they have specifically reserved to themselves in their organic law? If so, the majority opinion of the court is correct. But, to my mind, the language of the Constitution is so plain and so simple as will admit of no construction, and if it needs must be construed, then it should be done under and by the well-recognized rules of construction for organic instruments; no strained or far-fetched meaning should be given it.

As was said by Mr. Justice Lamar of the Supreme Court of the United States in *Lake County v. Rollins,* 130 U. S. 662, 9 Sup. Ct. 651, 32 L. Ed. 1060:

"Why not assume that the framers of the Constitution, and the people who voted it into existence, meant exactly what it says? At the first glance, its reading produces no impression of doubt as to the meaning. It seems all sufficiently plain; and in such case there is a well-settled rule which we must observe. The object of construction, applied to a constitution, is to give effect to the intent of its framers, and of the people in adopting it. This intent is to be found in the instrument itself; and, when the text of a constitutional provision is not ambiguous, the courts, in giving construction thereto, are not at liberty to search for its meaning beyond the instrument. To get at the thought or meaning expressed in a statute, a contract, or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them. If the words convey a definite meaning which involves no absurdity, nor any contradiction of other parts of the instrument, then that meaning, apparent on the face of the instrument, must be accepted, and neither the courts nor the Legislature have the right to add to it or take from it. * * * There is even stronger reason for adhering to this rule in the case of a constitution than in that of a statute, since the latter is passed by a deliberative body of small numbers, a large proportion of whose members are more or less conversant with the niceties of construction and discrimination, and fuller opportunity exists for attention and revision of such a character, while constitutions, although framed by conventions, are yet created by the votes of the entire body of electors in a state, the most of whom are little disposed, even if they were able to, to engage in such refinements. The simplest and most obvious interpretation of a constitution, if in itself sensi-

ble, is the most likely to be that meant by the people in its adoption."

In *People v. Purdy,* 2 Hill (N. Y.) 35, Mr. Justice Bronson, commenting on the dangers of departing from the import and meaning of the language used to express the intent, and hunting after probable meanings not clearly embraced in that language, says:

"In this way  *  *  *  the Constitution  *  *  *  is made to mean one thing by one man and something else by another, until in the end it is in danger of being rendered a mere dead letter; and that, too, where the language is so plain and explicit that it is impossible to make it mean more than one thing, unless we first lose sight of the instrument itself and  *  *  *  roam at large in the boundless field of speculation."

I think the above is the rule of construction we are bound to follow, if any construction at all is needed; and hence, in the light of the foregoing sections, we may properly ask ourselves the question, Is the issuance of approximately $3,000,000 of bonds, to take up an equal amount of the outstanding state warrants, the creation of a debt within the meaning of the sections hereinabove quoted? If so, then the state cannot exceed the $400,000-limit fixed by section 23 by this refunding method. If it is a debt, then the only relief is by the Legislature through the medium of section 25, *supra.* If it is not a debt, then can the state, in this manner, go beyond such limit even to meet a casual deficit on account of the failure of revenues for any cause? Or would it be reasonable to say that by sections 23 and 25, construed together, casual deficits may be made up to the amount of $400,000 by the methods sought in this proceeding, but when that amount is reached, further evidence of indebtedness shall not be issued without the assent of the electors of the state, as provided by section 25 of the Constitution, *supra?* This to my mind is the only reasonable construction to be placed upon the constitional provisions under consideration. As has been suggested by Hon. John B. Harrison, himself a member of the constitutional convention, in a paper on this subject, and whose views are in complete harmony with my own:

"This conclusion is further borne out by the provisions of section 26 of the Constitution, which provides that no county, township, school district, or other political corporation or subdivision of the state shall be allowed to become indebted in any manner in any year in excess of the revenue provided for such year, without the assent of three-fifths of the electors voting on such question. Casual deficits in the affairs of municipal subdivisions shall not exceed the revenue provided for that year; while in the affairs of the state, they shall not exceed $400,000 in excess of the revenues. In other words, a municipal subdivision of the state is expressly limited in the amount of indebtedness it may incur for any year to the revenue provided for such year. But the expenses of the state being far greater and more complicated and more difficult of accurate ascertainment, the state is wisely given a margin of $400,000 in excess of the revenues provided. But in neither case shall those fixed limitations be exceeded without a vote of the people on the question. In subdivisions of the state, the right is given to the voters of the municipality; in the state at large, such right is reserved to the electorate of the state, to be submitted by the Legislature. This thought runs through every revenue-raising and debt-limiting section of the Constitution. It is the one unbroken chain by which the entire revenue system is linked together as a comprehensible whole. To give it this meaning is to give it an effectual working force, which, though cumbersome in its operation, is nevertheless complete in itself. But to eliminate this thought is to strip it of its potency and render it a mere powerless, meaningless, incoherent rattle of words. This, in my judgment, should not be done. The inadequacy of the law to afford as speedy relief as is necessary under the present conditions is no fault of the courts. The functions of the court are to interpret and construe the law as it is found, and not to distort it to suit economical conditions or meet political expediencies. I have studied the authorities which attempt to distinguish between debts and questions like the one confronting us. Some of them, it must be conceded, are models of ingenious argument, and elusive, nifty, drapery of thought, but, in my judgment, their proper abode is in the realms of theory rather than of reason. If there is a real logical distinction, then I must confess that my mind is too dull of perception, too finite in scope, to trace those infinite lines. I am unable to see the legal difference between a debt and an obligation which ought to be paid and no money with which to pay it. I cannot comprehend the legal distinction between a debt and an unpaid warrant drawn on a depleted treasury. I cannot

differentiate between the significance of a debt and deficit which must be met. And I am not unmindful of the argument that the people of the state assumed the solemn, legal, and moral obligation to maintain the state government and pay the expenses thereof. Nor have I overlooked the contention that the necessary running expenses of the state is not a debt within the debt-limiting provisions of most state constitutions. Nor the argument that the issuance of bonds with which to meet unpaid outstanding warrants is not creating a debt, but merely changing the form thereof. But a concession of the full force of these arguments is a confession that the original unpaid warrants are a debt. Besides, it must be observed that the provisions of our Constitution are peculiarly and cautiously worded. It provides in section 23, art. 10, that to meet casual deficits the state may contract debts to the amount of $400,000. This, of course, is to be done according to the procedure provided by statute. But, whenever such deficit exceeds $400,000, or whenever a debt for any purpose is sought to be contracted, the Legislature must pass a law creating such debt, and such law must be submitted to the voters of the state for sanction or rejection. This, in my judgment, is the procedure contemplated by the Constitution, and as herein stated, while it is cumbersome and tardy in granting relief, it is nevertheless the only procedure we have."

In view of the foregoing, how can we say that following the rule announced in *Re Application of State to Issue Bonds to Fund Indebtedness,* 33 Okla. 797, 127 Pac. 1065, would not result in working a gross or manifest injustice to all the people of the state, and would not do violence to the plain provisions of our organic law? To me such a result is inevitable, and, this being true, this court ought not to be bound by that, or any other decision, which would work such an irreparable hardship and wrong. The application to fund should be denied.