In re STATE TREASURY NOTE
INDEBTEDNESS.

In re FUNDING BONDS OF 1939.
SERIES A.

No. 29179.   April 24, 1939.

Rehearing Denied April 25, 1939.

Mac Q. Williamson, Atty. Gen., and Randell S. Cobb, Asst. Atty. Gen., for the state.

D. D. Archer and Fred M. Black, for the protestant.

OSBORN, J. This is an original proceeding brought in the Supreme Court through the Oklahoma Funding Bond Commission, pursuant to the provisions of Senate Bill No. 239, enacted by the Seventeenth Legislature of the State of Oklahoma, approved by the Governor April 10, 1939, for the purpose of funding $18,000,000 of outstanding and unpaid state treasury notes of the State of Oklahoma, issued in anticipation of the general revenues of the state, pursuant to the provisions of article 3, ch. 27, S. L. 1937, page 123, which with the interest due thereon to May 1, 1939. amount in the aggregate to the sum of $18,156,681. It is made to appear from the application and evidence submitted in support thereof that it is the purpose of the Oklahoma Funding Bond Commission to fund said state treasury note indebtedness by the issuance of negotiable coupon bonds of the State of Oklahoma. designated "Funding Bonds of 1939, Series A," in the sum of $18,156,681, dated May 1, 1939, and maturing $750,000 on June 30th of each of the years 1940 to 1946, inclusive; $1,600,000 on June 30th of each of the years 1947 to to 1953, inclusive; and $1,- 706,681 on June 30, 1954. $12,145,000 of said bonds are to be exchanged for the simultaneous surrender and cancellation of $12,- 145,000 of state treasury notes; and $6,- 011,681 of said funding bonds have been sold for delivery on May 1, 1939, for $6,- 011,681 and a premium of $10, which amount of money is to be used in paying the interest due on said $12,145.000 of state treasury notes on May 1, 1939, and in paying the principal and interest due on $5,855,000 of state treasury notes due on May 1, 1939.

All of the $18,156,681 of bonds were sold at an advertised sale held on April 14, 1939. to the highest bidder agreeing to pay par and accrued interest for the bonds and bidding the lowest rate of interest the bonds are to bear, except that the Oklahoma Funding Bond Commission required the successful bidder to permit the exchange of $12,- 145,000 of said bonds for notes, making the amount of bonds to be delivered to the

purchaser amount to $6,011,681. The bonds were sold to The Chase National Bank of New York, N. Y., and associates. The bonds bear the rate of interest fixed by said sale as follows:

The bonds maturing June 30, 1940, to June 30, 1948, inclusive, bear interest at the rate of 2¼ per cent. per annum, and

The bonds maturing June 30, 1949, to June 30, 1954, inclusive, bear interest at the rate of 2 per cent. per annum.

The average rate of interest the bonds are to bear is 2.07176 per cent.

Section 4 of Senate Bill No. 239 of the Seventeenth Legislature, approved April 10, 1939, conferred exclusive original jurisdiction upon the Supreme Court to hear and determine this application to fund. Notice was published in a legal newspaper on April 11, 1939, and in each daily issue of said newspaper to and including April 20, 1939, that the application would be presented to the Supreme Court for a hearing thereon on the 21st day of April, 1939, at 10 o'clock, a. m., and that the Attorney General would present for and on behalf of the State of Oklahoma and the Oklahoma Funding Bond Commission an application to the Supreme Court of Oklahoma to approve $18,156,681 of State Funding Bonds of 1939, Series A, dated May 1, 1939, for the purpose of funding and paying $18,156,681 of treasury notes of the State of Oklahoma. The notice further stated that all persons interested might file a protest against the issuance of said bonds and be present at said hearing and contest the issuance of said funding bonds or any part thereof. This notice was sufficient to put any person interested upon inquiry. The fact that the notice stated that an application would be presented to the Supreme Court to approve $18,156,681 of state funding bonds for the purpose of funding and paying $18,156,681 of treasury notes of the State of Oklahoma instead of the principal and interest on $18,000,000 of state treasury notes does not make the notice defective.

"Mere informalities in a notice which do not mislead will not vitiate it; and, while a particular form of notice required by statute must usually be followed with reasonable strictness, it is generally sufficient if the notice proceeds from an authentic source and fully informs the parties to be notified of the substance of the matters required to be noticed (citing 5 Words and Phrases, pp. 4842-4844; see, also, vol. 8, p. 7733)." Tooele Meat & Storage Co. v. Morse, 43 Utah, 515, 136 P. 965; Foster

v. Focht, 102 Okla. 261, 229 P. 444; 46 C. J. 554.

It should be noted that in section 2 of Senate Bill No. 239 the state is authorized to issue its negotiable coupon bonds for the purpose of funding treasury notes, plus the accrued interest thereon to the date of the bonds issued to fund the same. We find and determine that the notice which was published is a sufficient and legal notice; that the same was published and given in conformity to the provisions of section 4 of Senate Bill No. 239; and that the same constitutes due and proper notice of this proceeding.

A protest was filed against the issuance of the bonds by A. V. Boswell, a citizen and taxpayer of the state. On the 21st day of April, 1939, the parties appeared before the court and the matter was referred to Justice Osborn for the taking of testimony. The applicant, the State of Oklahoma, through the Oklahoma Funding Bond Commission, appeared by the Attorney General and submitted testimony in proof of the existence, validity, and amount of the state treasury notes sought to be funded, and requested the court to approve the $18,156,681 of State of Oklahoma "Funding Bonds of 1939, Series A," dated May 1, 1939. The protestant offered evidence in opposition thereto, and the case was heard by the court on the 22nd day of April, 1939, when counsel for both parties submitted briefs and oral arguments in support of their respective positions.

Protestant urges that this court is without jurisdiction for the reason that the Legislature was without authority to confer exclusive original jurisdiction upon this court to hear and determine this proceeding. Section 2 of article 7, Oklahoma Constitution, after prescribing the appellate and original jurisdiction of the Supreme Court in certain classes of cases, adds: "and the Supreme Court may exercise such other and further jurisdiction as may be conferred upon it by law." In El Reno Wholesale Grocery Co. v. Taylor, County Treasurer, 87 Okla. 140, 209 P. 749, it was held that: "In matters of general public interest, matters which directly affect the sovereign rights and powers of the state, the Legislature has power, under section 2, article 7, to confer original jurisdiction upon this court." The contention of protestant is without merit.

Protestant further contends that Senate Bill No. 239, enacted by the Seventeenth Legislature of the State of Oklahoma, approved April 10, 1939, violates section 57, of article 5, Oklahoma Constitution, in that it embraces more than one subject. That an act involves many details does not offend the requirement that each act shall embrace but one subject, if all the details relate to the same general subject. C. C. Julian Oil & Royalties Co. v. Capshaw, 145 Okla. 237, 292 P. 841. The act under consideration embraces but one general subject, the funding of certain state indebtedness, and does not violate section 57, article 5, Oklahoma Constitution.

Protestant also contends that Senate Bill No. 239 is defective in that the Attorney General is made a member of the Oklahoma Funding Bond Commission, and by section 6 of the act it is made his duty to execute a certificate on the back of each bond that the bond is issued according to law and is within the debt limitation, thus requiring the Attorney General to act in a dual capacity. There is no inhibition in the Oklahoma Constitution against the Attorney General so acting.

Protestant contends that Senate Bill No. 239 violates section 23 of article 10, Oklahoma Constitution, for the reason that said act permits and authorizes the creation of a state debt in excess of $400,000 and that said act was never submitted to and voted upon by the people of the state. The state treasury notes proposed to be funded are as follows: $8,000,000 state treasury notes designated 1937-38 Series A, due May 1, 1939, and bearing interest at the rate of 2 per cent. per annum; $7,700,000 of said notes were dated August 20, 1938; $200,000 were dated September 15, 1938; and $100,000 were dated September 27, 1938; $2,000,000 state treasury notes designated 1938-39 Series A, dated November 1, 1938, due May 1, 1939, and bearing interest at the rate of 1½ per cent. per annum; $3,000,000 state treasury notes designated 1938-39 Series B, dated December 1, 1938, due May 1, 1939, and bearing interest at the rate of 1¼ per cent. per annum; $2,000,000 state treasury notes designated 1938-39 Series C, dated January 7, 1939, due May 1, 1939, and bearing interest at the rate of 1¼ per cent. per annum; $3,000,000 state treasury notes designated 1938-39 Series D, dated February 15, 1939, due May 1, 1939, and bearing interest at the rate of 1¼ per cent. per annum. All of said notes were issued under authority of article 3, chap. 27, S. L. 1937, page 123. Said notes were issued in anticipation of the receipt of the revenues of the general fund for the fiscal

year for which they were issued for the purpose of acquiring money with which to pay valid warrants issued pursuant to appropriations made by the Legislature out of the general fund of the state. The State Treasurer and Assistant State Auditor testified that the moneys derived from the issuance of said state treasury notes were used and disbursed in the payment of valid general fund warrants of the State of Oklahoma for the fiscal year for which said state treasury notes were issued. The notes were issued as funds were needed to meet the current operating expenses of the state, but only after warrants had been issued or claims had accrued within appropriations made by the Legislature. They further testified that if said notes had not been issued, said general fund deficit would have been represented by nonpayable warrants bearing interest at the rate of 4 per cent. per annum instead of by these treasury notes, and that only so many treasury notes were issued as were necessary to meet the immediate needs of the state in the payment of claims validly accrued; that the issuance of said notes resulted in a considerable saving in interest to the state; and that it is necessary that said state treasury notes be funded for the reason that it is now known that sufficient general revenues will not accrue to pay said state treasury notes on May 1, 1939, when they mature.

The validity of the appropriations made against the general fund for which said notes were issued was sustained in the case of Davis v. Childers, 181 Okla. 468, 74 P.2d 930.

The validity of chapter 27, art. 3, S. L. 1937, p. 123, under which said treasury notes were issued, was upheld in the case of Schmoldt v. Bolen, 183 Okla. 191, 80 P.2d 609. See, also: State ex rel. Black v. Eagleson, 32 Idaho, 276, 181 P. 934; State v. State Board of Examiners, 59 Mont. 557, 197 P. 988; and In re State Warrants, 6 S. D. 518, 62 N. W. 101. The South Dakota case is cited with approval in the cases of Bryan v. Menefee, State Treasurer, 21 Okla. 1, 95 P. 471; and in Re Application of State to Issue Bonds, 33 Okla. 797, 127 P. 1065. In Schmoldt v. Bolen this court said:

"In the cases referred to it is said that the states generally hold that the term 'debt' within the debt limitations, does not refer to those obligations incurred for current appropriations within the biennium for which presumably revenues have been or, under lawful power, will be provided for."

Warrants issued in anticipation of taxes are not debts prohibited by sections 23, 24 and 25, article 10, Oklahoma Constitution. We reiterate our language in Schmoldt v. Bolen, supra:

"It is the validity of the primary obligation that determines the right, or the invalidity thereof that determines the wrong. We find no wrong in providing a means of taking up properly issued warrants by use of notes of less burden, payable out of the same revenues from which the warrants ultimately would be payable."

And claims accrued for which warrants may be validly issued are likewise not debts. We therefore find and determine the state treasury note indebtedness of the State of Oklahoma to exist in the total sum of $18,-156,681 as of May 1, 1939, and that said state treasury notes are valid and existing obligations of the State of Oklahoma subject to being funded in accordance with the provisions of Senate Bill No. 239, supra.

Senate Bill No. 239, under which the bonds under consideration are being issued, does not violate section 23, article 10, Oklahoma Constitution. Bonds which are issued to fund valid indebtedness of the state neither create any debt nor increase the debt of the state. In re Menefee, State Treasurer, 22 Okla. 365, 97 P. 1014; In re Application of State to Issue Bonds, 33 Okla. 797, 127 P. 1065; Id., 40 Okla. 145, 136 P. 1104; In re State Funding Bonds of 1935, Series A, 173 Okla. 622, 50 P.2d 221; and In re State Funding Bonds of 1935, Series B, 173 Okla. 626, 50 P.2d 226. Whatever construction might be placed upon the above constitutional provision if its interpretation were before us for the first time, we are not willing to depart from the construction placed thereon, and necessarily relied on, in the long-standing opinions of this court above cited. Under the rule of stare decisis, we follow them.

In section 3 of Senate Bill No. 239, it is provided:

"**Each series of bonds shall be issued to mature in not more than fifteen (15) annual installments, beginning June 30, 1940.** No installment or bond shall be made to mature more than sixteen (16) years from its date. Such installments need not be in equal amounts but the amount of each shall be determined by the Commission. The Commission shall provide for the maturing and retirement of said bonds so that not less than seven hundred fifty thousand ($750,000.00) Dollars shall mature each year up to and including the fiscal year ending June 30, 1946. Thereafter the balance of the bonds shall mature in equal annual installments insofar as may be practicable; provided, that none of said bonds shall mature later than June 30, 1955. The bonds

maturing on or after five (5) years from their respective dates may contain a provision providing that they may be called and paid on any interest paying date, and upon such terms as may be prescribed by the Commission. * * *"

In section 9 of Senate Bill No. 239 it is provided:

"There is hereby created a special fund in the office of the State Treasurer, to be known as the 'Funding Bond Fund of 1939;' Any moneys accruing to the general fund of the state for the fiscal year ending June 30, 1939, after all obligations incurred against said fund have been paid or funded, shall be placed in the aforesaid special fund for the purpose of paying the principal and interest of the bonds issued under authority of this act. In addition the State Treasurer shall set aside, monthly, out of the first state general fund revenues collected each fiscal year, commencing with the fiscal year 1939-40 and ending with the fiscal year 1954-55, one-twelfth (1/12) of the sum sufficient to pay the interest on the funding bonds herein authorized to be issued, and the maturing funding bonds herein authorized to be issued and due and payable during such fiscal year; provided, that said apportionment shall not be made until provision has been made for the payment of the principal and interest of the 1935 Funding Bonds as provided in section 8 of article 1, chapter 27, Session Laws 1935, page 104."

The funding bonds that are being issued were made to mature in 15 annual installments beginning June 30, 1940. It will be noted that the first sentence in the above quotation from section 3 is definite and specific in that it is there stated that each series of bonds shall be issued to mature in not more than 15 annual installments beginning June 30, 1940. The later language is permissive in that it states that no installment or bond shall be made to mature more than 16 years from its date. The act does not require that the installments be in equal amounts. The first installment of the bonds matures June 30, 1940, and the last installment matures June 30, 1954, or 15 years and 2 months from the date of the bonds, May 1, 1939.

One-twelfth (1/12) of the general fund revenues will be set aside each month for the payment of the principal and interest of the bonds maturing each fiscal year. Such apportionment will begin July 1, 1939, and will end June 30, 1954. The language in section 9 quoted above provided that such apportionment would end with the close of the fiscal year 1954-55. It will not be necessary to make the apportionment for the fiscal year 1954-55, since the last installment of the bonds matures on June 30, 1954.

"Where general terms or expressions in one part of the statute are inconsistent with more specific or particular provisions in another part, the particular provision will be given effect, as a clearer and more definite expression of the legislative will." Palmer v. King, 75 Okla. 276, 183 P. 411.

We are of the view that the specific and definite provision in the statute that the bonds be issued to mature in not more than 15 annual installments, beginning June 30, 1940, controls over the other provisions which are permissive only. We therefore find and determine that the State of Oklahoma "Funding Bonds of 1939, Series A," mature as authorized and provided by sections 3 and 9 of Senate Bill No. 239 of the Seventeenth Legislature of the State of Oklahoma, approved April 10, 1939.

The provision of section 3, article 10, Oklahoma Constitution, for paying deficiencies which may arise during any fiscal year, where the ordinary current expenses of the state exceed its income from current taxation and other resources, is not exclusive. In re Application of State to Issue Bonds, supra, and In re Funding Bonds of 1935, Series A, supra. In this last case, the court, speaking with reference to section 3, article 10, Oklahoma Constitution, said:

"As we have pointed out above, this provision that the deficit of any year may be provided for in the ensuing year is not exclusive. In re Application of State to Issue Bonds, supra. To avoid the hardship of raising the revenue to pay this deficit in one year, the Legislature in said case was held to have the authority to spread such burden over a number of years by the issuance of long time low interest bearing bonds as is being done under the act here under consideration. When the Legislature provides for the funding of such deficit by the issuance of bonds, the bonds are payable in the manner and from the revenues provided by the law under which such bonds are issued. In this case the Legislature created the manner and method of payment, which is not in contravention of section 4, article 10, supra."

Provision is made for the payment of the principal and interest of the bonds in section 9 of Senate Bill No. 239. Said section is quoted in part above. In addition said section provides:

"Said moneys, when apportioned as provided in this section, shall be by the State Treasurer placed to the credit of the special fund heretofore created, and said general revenue funds are hereby irrevocably pledged to the payment of the principal and interest

of the bonds issued under this act. If the aforesaid revenues placed in and credited to the aforesaid special fund are insufficient in any year, to pay the principal and interest of the bonds falling due that year, the State of Oklahoma pledges itself to make funds available in a sum sufficient to make up said deficit. The full faith and credit of the State of Oklahoma is hereby pledged to the payment of the principal and interest accruing of and on said bonds. The State of Oklahoma hereby pledges itself that, in the event of any deficit in the funds as above allocated for the retirement of said interest and installments of bonds as the same become due, to levy such other and additional taxes as may be authorized by the Constitution of the State of Oklahoma for the express purpose of making up such deficit. The term 'State General Fund Revenues' as used herein, shall be understood to mean and are hereby defined to mean any and all revenues hereafter collected for any state purpose or purposes, excepting only such revenues as have been heretofore irrevocably pledged to or for some other purpose."

Section 9 of Senate Bill No. 239 is very similar to section 8 of article 1, ch. 27, S. L. 1935, before this court in Re State Funding Bonds of 1935, Series A, supra. Also. see Milburn v. Childers, 178 Okla. 84, 61 P.2d 1047. The State of Oklahoma "Funding Bonds of 1939, Series A," are payable in the manner and from the revenues provided in Senate Bill No. 239. The provisions of section 9 of said act constitute a valid pledge of the revenues of the state therein referred to, for the payment of the principal and interest of said bonds.

Protestant contends that Senate Bill No. 239 is unconstitutional because in sections 1 and 9 of said act the full faith, credit, and resources of the state are pledged to the payment of the bonds issued under the act. The funding bonds approved by this court in the case of In re Application of State to Issue Bonds. 33 Okla. 797, 127 P. 1065, pledged the full faith, credit, and resources of the state to their payment. Likewise, the funding bonds of 1935 pledged the full faith, credit, and resources of the state to their payment. See article 1, ch. 27, S. L. 1935; ch. 164, S. L. 1933; and article 3, ch. 27, S. L. 1937, page 123. Every time a nonpayable warrant is issued against a valid appropriation the credit of the state is pledged. Section 3549, O. S. 1931, is found in the article dealing with the duties of the State Auditor and the issuance of state warrants. Said section reads as follows: "For the redemption of all warrants issued in conformity with the provisions of this article, the credit of the state is hereby pledged." No provision of the Constitution

is violated by the Legislature pledging the full faith, credit, and resources of the state to the payment of an obligation which the state is legally bound to pay.

The question of the right of the Legislature to repeal or modify the provisions of said act is not before us in this proceeding. But no act of the state, through the Legislature, or otherwise, can take away the binding obligation of the state to provide revenues out of which said bonds may be paid. See In re Funding Bonds of 1935, Series A, supra.

In section 8 of Senate Bill No. 239 it is provided:

"The Commission may provide for the sale and exchange of bonds in the same series if the Commission finds it necessary to so do, to effect the funding of the treasury notes and warrants herein authorized to be funded."

Said section further provides:

"If the bonds herein authorized are so sold the Commission may require the purchaser thereof to afford present holders of treasury notes and warrants the privilege of exchanging such treasury notes or unpaid warrants for bonds under such rules and regulations as the Commission may prescribe."

The Oklahoma Funding Bond Commission decided that it was to the best interest of the state to fund all of the state treasury notes in one series of bonds, part of said bonds to be exchanged for treasury notes and part of the bonds to be sold to pay those notes where the holders did not desire to exchange them. In the case of In re State Funding Bonds of 1935, Series B, 173 Okla. 626, 50 P.2d 226, this court said:

"The weight of authority supports the doctrine that the issuance of bonds for the purpose of funding a valid debt does not create a new indebtedness, although they are sold and their proceeds devoted to the discharge of the outstanding debt, rather than exchanged for the evidence of such debt. There is no substantial ground for a distinction between the two methods of issuing funding bonds, where the proceeds of the sale are actually used for the retirement of the outstanding obligations funded. 97 A. L. R. 448, 452; vol. 6, McQuillin on Municipal Corporations (2d Ed.) section 2385."

In computing the indebtedness of municipalities in connection with the provisions of section 26 of article 10, Oklahoma Constitution, this court has held in a number of cases that cash in the sinking fund may be deducted from the outstanding bonds

in determining whether a proposed bond issue would exceed the debt limit imposed by said section. Kirk v. School District No. 24, 108 Okla. 81, 234 P. 596; Reynolds v. Stark, 90 Okla. 261, 217 P. 166; and Kansas City Southern Ry. Co. v. Board of Education of the City of Poteau, 158 Okla. 274, 13 P.2d 115.

In section 7 of Senate Bill No. 239 it is provided:

"The proceeds of the sale of such bonds shall be used solely for the payment of a like amount of principal of, and interest on the treasury notes and warrants authorized to be funded. If all of such notes and warrants are not available for surrender and cancellation on the date of the delivery of the bonds, the State Treasurer may either deliver bonds in the amount of the available notes and warrants and interest thereon, holding the remainder of the bonds for later delivery, or may deliver all of such bonds and place the unused part of the proceeds thereof in a special trust fund to be held solely for the payment of the remaining notes, warrants and interest thereon upon presentation, all as may be directed by the Commission."

The Commission at the time it authorized these funding bonds provided that the funds derived from the sale of that portion of the bonds to be sold should be placed by the State Treasurer in a special trust fund in his office to be used for no other purpose than paying the principal and interest of the notes funded. The evidence in this case discloses that the greater part of the notes, if not all, will be presented to the State Treasurer on May 1, 1939, for payment or exchange. The notes fall due on that date and they are all expected to be presented to the State Treasurer on that date. The above quoted provision of section 7 of the act is held to be valid.

There is no merit in protestant's contention that the state treasury notes cannot be funded as provided in Senate Bill No. 239 of the Seventeenth Legislature, approved April 10, 1939, because of the provision of section 4 of art. 3, ch. 27, S. L. 1937, page 124, that "when it is apparent that there will not be sufficient funds on hand to pay any notes issued hereunder at their maturity, it shall be the mandatory duty of the State Treasurer, State Auditor, and Governor to issue new notes under the procedure heretofore set forth for the purpose of acquiring funds to pay said notes." Senate Bill No. 239 is a later act of the Legislature and said notes may be funded as therein provided.

The bonds and coupons designated State of Oklahoma "Funding Bonds of 1939, Series A," are in proper form. The resolutions adopted by the Oklahoma Funding Bond Commission authorizing the issuance of said bonds and prescribing their form and fixing the other details of their issuance were introduced in evidence. The rates of interest the bonds are to bear were determined at an advertised sale by the bidder bidding the lowest rate of interest the bonds were to bear. The bonds are being executed by the lithographed facsimile signatures of the Governor and Secretary of State, under the seal of the state, and will be countersigned by the State Treasurer. We find and determine that said bonds and coupons have been authorized and prepared in accordance with the provisions of Senate Bill No. 239.

Senate Bill No. 239 provides in section 5 thereof that the final decision of the court shall be a judicial determination of the validity of the funding bonds approved and shall be conclusive as to the state, its officers, agents, and the public in general; that when the decision of the court approving the bonds has become final, the Chief Justice shall sign each bond approved and that thereafter the bonds approved shall be incontestable in any court in the State of Oklahoma and the bonds shall so state on their face. The bonds under consideration in this case contain that statement on their face.

The protest is denied. The prayer of the state's application is granted, and it is the judgment of the court that the State of Oklahoma "Funding Bonds of 1939, Series A," dated May 1, 1939, in the total sum of $18,156,681, be and the same are approved, and when this decision has become final, said bonds shall be signed by the Chief Justice of this court.

Pursuant to the provisions of section 5 of Senate Bill No. 239, the time within which a petition for rehearing may be filed in this cause is limited, and the time for filing a petition for rehearing shall expire at 2 o'clock p. m., on the 25th day of April, 1939.

BAYLESS, C. J., and CORN, GIBSON, and DAVISON, JJ., concur. WELCH, V. C. J., and RILEY and HURST, JJ., concur specially. DANNER, J., absent.

WELCH, V. C. J. (concurring specially). I concur in the disposition of this cause, and for the reasons assigned by RILEY and HURST, JJ., who likewise concur specially.

I, too, am of the view that our state can

and should arrange to handle all general obligation matters in a way more strictly in accord with the exact language and spirit of the Constitution. We should not permit our decisions to be so construed as to result in any practice of either creating or recognizing general obligations contrary to the definite constitutional limitation. From the arguments presented it is apparent that some such misconstruction of our previous decisions may require clarification of our views in event of any effort to extend the scope of our views. We can, of course, have no views contrary to the plain words of the Constitution. The privilege of issuing funding bonds cannot be converted into a plan to avoid the debt limitation for general purposes, or construed to authorize the exceeding of such limitation merely by following the form of refunding. I join my specially concurring associates in the view that we should make this plain.

While in some prior decisions we have properly found that particular obligations payable only out of specific receipts are not general debts, and while we have found it necessary and proper to approve this specific issue of funding bonds covering those specific prior obligations, we should recognize the fact that in this case we have approached the verge of the law on the subject, and that we can go no further when to do so would or might result in a pyramid of illegal and excessive debt for general purposes, by improper use or abuse of the privilege of issuing funding bonds.

RILEY, J. (concurring specially). I concur under the rule of stare decisis, in the interest of the credit of the state, and justice to those who have and hold evidences of state debt, but believing that the constitutional provision, section 23, art. 10, should be, by the court, interpreted as the people understood it at the time of adoption, in line with early applications in this and other states, and especially in view of present day views in California, Kentucky, and Colorado, and this notwithstanding local ingenious judicial decisions in effect holding that a debt is not a debt as prohibited and in the constitutional sense when it is a mere change of form or evidence of it.

Of course, "casual deficits" may arise. There may occur "failure in revenues" or be "expenses not provided for," in which event the state may "contract debt," thus recognize and provide for its liquidation. However, the constitutional inhibition plainly was intended to be a stop line beyond which we could not go either in creation or recognition of a debt judicially, legislatively, or casually. The fundamental law limits debts "direct and contingent," "singly or in the aggregate," at the amount of "four hundred thousand dollars." This is definite, certain, all inclusive, and should be continual in its application.

Recurrence to plain and simple meaning of fundamental law may be forewarned and had at a time favorable to the least injury.

It is thought that in publici juris causes a statement of possibility of recurrence is justified.

Destruction of public credit may occur as a result of unlimited recognition of debt. Such progress is marked by a continual failure to balance budgets. It is also recognized that value of warrants issued in excess of income from revenues provided may be impaired by authoritative views on fundamental but vital issues such as public finance. Between these extremes is the language of the Constitution, and our duty of observance of it under our oath of office, whereby it is contemplated that it will be upheld and defended.

HURST, J. (specially concurring). I concur in the conclusion. Those who purchased the notes to be refunded had a right to rely on our prior decisions, and the credit and honor of the state require that we follow those decisions in the instant case. However, I am of the opinion that those decisions (In re Application of State to Issue Bonds to Fund Indebtedness, 1912, 33 Okla. 797, 127 P. 1065; In re Application of State to Issue Bonds to Fund Indebtedness, 1913, 40 Okla. 145, 136 P. 1104; In re State Funding Bonds of 1935, Series A, 1935, 173 Okla. 622, 50 P.2d 221; In re State Funding Bonds of 1935, Series B, 1935, 173 Okla. 626, 50 P.2d 226) should now be overruled so that in the future no debt will be created in violation of our Constitution. By the foregoing decisions the provisions of our Constitution (secs. 2, 3, 23, 24, and 25 of art. 10) have, under the guise of judicial construction, been rendered nugatory. I base my opinion upon the plain language of the constitutional provisions, and upon the decisions of our sister states construing substantially the same constitutional provisions. See People v. Johnson (1856) 6 Cal. 499; Nougues v. Douglass (1857) 7 Cal. 65; Opinion of the Judges (1889, Colo.) 22 P. 464; State v. McGraw (1895. Wash.) 41 P. 893; State Budget Commission v. Lebus (1932, Ky.) 51 S. W.2d 965.

I think in the prior decisions, above cited,

this court did precisely what we refused to do in Boswell v. State (1937) 181 Okla. 435, 74 P.2d 940—gave these sections of our Constitution a narrow and strained construction that defeats their very purpose. The result is that we now have a debt of some $25,000,000, incurred without a vote of the people, for "casual deficits or failure in revenue, or for expenses not provided for" in face of the plain language of section 23 that "such debts (for said purposes), direct and contingent, singly or in the aggregate, shall not, at any time, exceed four hundred thousand dollars."

When the five constitutional provisions are construed together, according to their normal meaning, we find that under section 2 it is the duty of the Legislature "to provide by law for an annual tax sufficient, with other resources, to defray the estimated ordinary expenses of the state for each fiscal year." There is available to the Legislature data on which a fairly correct estimate can be made as to what amount of revenue will be forthcoming, based largely upon the collections of prior years, and it is the duty of the Legislature to make the appropriations square with the estimated income. The Governor has the right, by use of the veto power, to make the appropriations meet the anticipated income. If, after the appropriations are made and approved, it is seen that the revenues are running short, the Governor can call an extra session of the Legislature to balance the budget by providing more revenue or cancelling appropriations. If that is not done, it is the right of the Legislature in the next regular session, under section 3, to levy "a tax for the ensuing fiscal year, which, with other resources, shall be sufficient to pay the deficiency, as well as the ordinary expenses of the state for the ensuing year." The responsibility of conducting the ordinary governmental affairs of the state within its income rests with the legislative and executive departments. It is our duty to declare the law expressed in the Constitution according to the intent of those who framed it and of those who adopted it.

Under section 23, the casual deficits to the extent of $400,000 can be lawfully funded, but the debt for that purpose can never exceed $400,000 without doing violence to the Constitution.

The issuance of the funding bonds in question establishes an absolute liability to pay in the future. They bear interest. They mature at definite dates. They are promises to pay money. They pledge the credit of the state.

Can it be doubted that when these funding bonds are approved by this court and issued that a debt has been created? It will not do for us to split hairs on the question as to when the debt was actually created, whether at the time the service was performed or the article purchased, when the claim was allowed, when the warrant was issued, when the deficit was definitely ascertained, or when the funding bonds were issued, for it is certain that when the funding bonds have been approved by this court and issued, a debt has been created in excess of $400,000 in violation of section 23, art. 10, of the Constitution.

The language of the Supreme Court of California in 1857, construing similar constitutional provisions, is applicable here:

"The power of taxation was given to the Legislature, without limit, for all purposes allowed by the Constitution, and the framers of that instrument knew that it was not the practice of governments, well conducted, to borrow money for the ordinary expenses of government. These expenses are regular and certain, and can easily be provided for by taxation. In reference to such expenses, there is no cause for surprise upon the Legislature. It is easy to anticipate their amount with a reasonable degree of certainty, and the framers of the Constitution knew that if they permitted the Legislature to borrow money to defray the ordinary expenses of the government, it would not be long before the state must be brought practically to rely upon the yearly revenue; for the reason, that a yearly deficit of the revenue would soon destroy the credit of the state, so that she could not borrow for any such purpose. A family, or state, that borrows to pay ordinary expenses, must soon have no power to borrow; and as the state, from the very nature of the case, must sooner or later come to the point of 'paying as you go,' it was wise in the framers of our Constitution, to bring her to it at an early period. There was time gained and money saved.

"Besides this, the Convention doubtless thought it unjust to throw the burthen of paying the present expenses of the government upon posterity, who would be compelled, in addition, to pay their own expenses, or resort to the same method of postponement." Nougues v. Douglass, supra.

If the necessities of the case are sufficient to justify the incurring of a debt to pay the ordinary current expenses of the government, section 25, art. 10, supra, provides the method by submitting the question to a vote of the people.